[Crim. No. 5407. Second Dist., Div. One. June 11, 1957.]

THE PEOPLE, Respondent, v. LLOYD R. MASSEY et al., Defendants; THOMAS REYNOLDS, Appellant.

626

Isaac Pacht, Grant B. Cooper, Louis Miller and Harvey M. Grossman for Appellant.

Edmund G. Brown, Attorney General, Clarence A. Linn, Assistant Attorney General, Raymond M. Momboisse, Deputy Attorney General, S. Ernest Roll and William B. McKesson, District Attorneys (Los Angeles), Joseph L. Carr and Joseph P. Busch, Deputy District Attorneys, for Respondent.

WHITE, P. J.—In an indictment returned by the Grand Jury of Los Angeles County, defendants were accused of the crime of grand theft, a felony, in violation of Penal Code, section 487, subdivision 1, allegedly committed on or about July 17, 1953.

Following the entry of a plea of not guilty by both defendants, trial by jury was duly waived and the cause proceeded to trial before the court resulting in the conviction of both defendants of the crime charged against them. Motions for a new trial were denied and defendants were sentenced to serve a term of one year in the county jail. Execution of sentence as to each defendant was suspended, and conditional probation granted. From the judgment of conviction and the order denying motions for a new trial each defendant gave notice of appeal. Subsequently, at the request of counsel for defendant Massey, his appeal was dismissed, and we are here concerned only with the appeal of defendant Reynolds.

Consideration of the appeal of defendant Reynolds (hereinafter referred to as appellant) will be facilitated by here setting forth the names and connection of those mentioned in the narrative of the background surrounding this prosecution, and about to be unfolded.

*Appellant Thomas Reynolds* is an attorney at law, and a member of the firm of Reynolds, Painter and Cherniss, with offices in Los Angeles. At the time of trial Reynolds had practiced his profession for 33 years, and there was testimony that he enjoyed the reputation of being a capable practitioner. At the time of the transaction here involved, appellant's law firm was from time to time the attorney for the United Sav-

ings and Loan Association, defendant Massey and for the Anderson estate, all to be hereinafter referred to.

*Defendant Massey* is also an attorney at law and engaged actively in that profession until 1945 when he organized United Savings and Loan Association, (hereinafter referred to as "United") and of which he became president, manager and chairman of the board of directors, offices which he occupied until September, 1953 when the controlling stock interest was sold by him and other shareholders to La Mirada Rental Company, a partnership composed of Harold L. Shaw, his wife Martha J. Shaw and John Moore Robinson.

Of the 750 authorized and outstanding guaranty shares of United, Massey owned 154 in 1952. In May, 1953, he acquired 3 additional shares from a stockholder, Mary Kondeff, and on July 6th purchased 46 shares from his mother, making a total of 203 shares which he owned prior to July 17th. The remaining shares were distributed among the directors and various stockholders of United.

Affiliated with the business of United, but separate and distinct entities were United Mortgage Corporation and Valley Insurance Agency—activities in which Massey was profitably engaged and which were referred to at the trial as the "fringe benefits."

United Mortgage Corporation was engaged in the business of servicing Veterans Administration loans, making collections, disbursing taxes and conducting escrows. Massey owned slightly less than one-half of its shares.

Valley Insurance Agency was a sole proprietorship owned by Massey and engaged in the business of insurance broker. This organization wrote fire insurance policies for dwellings upon which United had made home loans.

### The Anderson Family :

*Charles A. Anderson* was a resident of Los Angeles for many years. He and his predeceased wife Emma owned as joint tenants 110 shares of United purchased by them in 1945 and 1949. Anderson died intestate on September 18, 1952, and it was from his estate that the theft of 110 shares of stock was charged. At the time of his death and for approximately a year prior thereto, Anderson was the administrator of the estate of his deceased wife and appellant Reynolds was his attorney.

*Mrs. Helen Schwartz* was Mr. Anderson's sister. She was a resident of Springfield, Ohio, having lived there nearly all

of her life. She had never lived in California. She became administratrix of the Anderson estate.

*Harold L. Shaw* was a contractor, and as heretofore mentioned, a partner in La Mirada Rental Company, which in September, 1953, purchased controlling stock interest in United.

*John Moore Robinson* was also a partner in La Mirada Rental Company, and counsel for Mr. Shaw.

*Julia Robertson Cook,* also known as Julia Robertson, was a successful mortgage loan broker who had known defendant Massey for several years and who had done business with United, securing customers for its real estate loans from 1949 to 1951. Since 1951 Mrs. Cook has acted as a representative for Harold L. Shaw. She knew defendant Massey and had secured several building and construction loans from United in connection with Shaw's business. As the factual background herein is revealed it will appear that she was active in the negotiations between defendant Massey and the Shaw group for the sale of a controlling interest in United.

The trial was a prolonged one and from a careful examination of the lengthy reporter's transcript and aided by the exhaustive briefs filed herein, we regard the following as a fair epitome of the evidence vital to a determination of the issues presented on this appeal.

The record reflects that on June 10, 1952, Donald Metz, accompanied by his attorney Alfred Gitelson, conferred with appellant and defendant Massey concerning the possible purchase of United. The conference took place at appellant's office. Defendant Massey represented that he controlled a large portion of the stock and could persuade the other shareholders to sell. The price suggested by defendant Massey was in excess of $2,000 per share, provided defendant Massey would retain certain appurtenances of the business, to wit, United Mortgage Corporation and Valley Insurance Agency, referred to at the trial as "fringe benefits." Mr. Metz testified, "that immediately upon hearing the price I for myself and the other people whom I represented lost interest in the purchase because the price was so high." This witness further testified that "being in the mortgage business and insurance business myself, I feel—it was my opinion and still is that those two items are one of the most valuable assets of any association like the association in question."

In June or July, 1952, Sidney M. Taper, a land developer and mortgage banker who was not acquainted with but knew

of defendant Massey, called on the latter and after discussing financing and market conditions, inquired of defendant Massey if the stock of United was for sale. According to this witness defendant Massey, "didn't say it was, he didn't say it wasn't. He just showed me a balance sheet, a statement of conditions . . . we entered into a discussion of values" of the assets of United. No price was quoted or discussed at this meeting which was adjourned with comment by Mr. Taper, ". . . I will get in touch with you again." Subsequently, a second meeting took place in July or August at which there were present defendant Massey, Mr. Taper, and the latter's attorney William Gilkbarg. At this meeting, according to the testimony of Attorney Gilkbarg defendant Massey represented that the book value of United's shares was $2,287.50 each. Attorney Gilkbarg suggested, "it seems to me that the very most the thing is worth is a million and a quarter." Defendant Massey inquired of his visitors as to whether they were prepared to make such an offer, although he did not consider the price adequate. On the day following this meeting, defendant Massey stated to Kline Dolan, a Vice President of United, that, "Mr. Taper might consider making a million and a half dollars offer for the stock of the Association (United)."

On September 18, 1952, Charles A. Anderson died intestate, leaving 20 surviving heirs consisting of sisters, brothers and their descendants. One of the surviving sisters was Mrs. Helen Schwartz, and at the time of her brother's death she resided in Springfield, Ohio, where she had lived "nearly all my life." Decedent Anderson's housekeeper informed appellant of the death of Mr. Anderson and suggested that appellant telephone decedent's sister Mrs. Schwartz because "he seemed to depend upon her more than anyone else." Appellant telephoned Mrs. Schwartz, and according to the latter's testimony, ". . . he asked me if I could come out here (to Los Angeles). He wanted us to fly; I asked him if it would be all right for me to bring my niece with me; and he said it would because I just couldn't make the trip by myself." Arriving in Los Angeles on the following morning Mrs. Schwartz and her niece met appellant for the first time. After funeral arrangements had been completed appellant, Mrs. Schwartz and her niece Mrs. Ell discussed the settlement of Anderson's affairs. According to the testimony of Mrs. Schwartz appellant said, ". . . would I be administrator. Well, I guess I didn't even answer him because I just didn't

630

—I was tired and I just wasn't even thinking, see. And then my niece spoke up and said that her brother lived here," Russell Hale, why couldn't he be appointed administrator. Mrs. Ell testified that when appellant "asked Mrs. Schwartz who she thought would be the one to settle up the estate; and I told him I thought my brother should since he was a resident of California . . . I told him it was Russell Hale and he was in the Probation Department of the Los Angeles County." The witness further testified that appellant then said, "You want to settle it up don't you, Mrs. Schwartz?" whereupon the witness said, "What about her not being a resident of California?" to which appellant replied, "I can fix that up." There is testimony in the record by Mrs. Schwartz that appellant explained to her that to qualify as an administratrix of the estate of her brother she ". . . would have to live out here . . . I would have to take up my residence at 1419 29th Street (decedent Anderson's home)." Appellant prepared a petition for the issuance of letters testamentary to Mrs. Schwartz which she signed, and on October 16th she was appointed administratrix of the estate of Charles A. Anderson, deceased. Appellant acted as her attorney. After remaining in California some six weeks, Mrs. Schwartz returned to Ohio. Between September 18th and December 31st, 1952, according to appellant's testimony, on at least two occasions defendant Massey expressed an interest in purchasing the estate of Anderson stock in United, saying on one occasion, "Is the estate going to sell the stock, and if so I would like to have a chance to buy it."

In November, 1952, the state inheritance tax appraiser for the Anderson estate called United on the telephone and inquired for the secretary. He was connected with defendant Massey. After identifying himself, the inheritance tax appraiser stated the purpose of his inquiry, and was informed by Massey that the 110 shares of stock in United had been appraised in the estate of decedent's predeceased wife at $200, that this sum was its present value. Based upon this information, the 110 shares of stock in United belonging to the estate of Anderson were appraised in the same amount, totaling $22,000. Wilbur J. Best, an assistant state inheritance tax appraiser, testified that after subsequent investigation and the receipt of additional information, the stock was reappraised at $1,050 per share or a total of $115,500. In the year 1952, because he was suffering from bad health, defendant Massey considered selling his stock in United. With

this purpose in mind, Massey discussed with Howard Ahmanson the purchase of the stock in United. Mr. Ahmanson offered to purchase all of the stock of United, totaling 750 shares at from $975,000 to $1,300,000 or between $1,300 and $1,730 per share provided the appurtenances, the mortgage company, the collection business and the insurance business were included in the sale. Mr. Ahmanson testified that, "Mr. Massey didn't register any great enthusiasm about accepting the offer . . . I told him that I didn't think it was a very generous offer, myself; which it wasn't," and that about a week or ten days thereafter, defendant Massey called the witness and "said that he was not interested."

Late in February or early March, 1953, Mrs. Julia Robertson Cook visited defendant Massey at the latter's home. During the course of the visit defendant Massey asked if Mr. Shaw would be interested in purchasing United for between a million and two million dollars. She informed him that she would transmit the inquiry to Mr. Shaw.

Subsequently, Mrs. Cook informed defendant Massey that Mr. Shaw was interested in the purchase but would buy only if he could obtain the controlling interest.

In the period between this first discussion in February or March and July 23d, Mrs. Cook, as Mr. Shaw's representative, saw Mr. Massey several times and conversed with him over the telephone concerning the sale of United. Mrs. Cook testified that, "Mr. Massey said he wanted something in writing from Mr. Shaw with reference to his purchase of the United Savings & Loan Association" and that she "would repeat it to Mr. Shaw," but that "I don't believe this specific subject came up . . . after that."

On March 2, 1953, appellant wrote Mrs. Schwartz to tell her that he had been informed that United had a buyer for the stock at $200 per share. In that letter he stated that "it may be worth more," but "recently, however, things have not been quite so good in that line of business." The letter was prompted by a conversation with defendant Massey in which the latter again expressed an interest in purchasing the stock.

On March 9, 1953, Mrs. Schwartz wrote and expressed her belief that Mr. Massey knew that the estate had to sell the stock, therefore, it would be best for the appellant to try and find another buyer. The appellant, however, never attempted to contact any other buyer.

In June, 1952, Donald Metz, a builder and subdivider who

was interested in acquiring a building and loan association, and his attorney had a conference at appellant Reynolds' office with Massey and Reynolds to discuss a possible sale of the stock of United.

Massey mentioned a price in excess of $2,000 per share for all of the shares and specified that the sale did not include the fringe benefits. Metz considered the price exorbitant, made no offer and nothing came of the conference.

During the following months, Sidney Taper and his attorney met with defendant Massey to investigate the financial condition of United as a basis for discussing the purchase of substantially all the shares of the association if available.

A memorandum of the assets and resources of United which was prepared at the meeting stated that the stock had a book value of $2,287.50 per share.

During the meeting, defendant Massey said that the value of the assets of United was $1,750.000. Taper figured that the assets of United were worth $1,250,000, and in which he included the fringe benefits. This figure was arrived at by him after discounting the assets in accordance with prudent purchasing practices. Defendant Massey, however, was not interested in Taper's figures and negotiations for the sale of the shares came to an end.

There was testimony that following beneficial results of a surgical operation in 1953, defendant Massey returned to active fulltime work in United, and that in May of that year, Glen W. Landes, who was engaged in the hardware business, and who was a former director and stockholder of United, called upon Massey on behalf of certain undisclosed principals to secure an expression concerning a sale of United. Massey told Landes that he would sell anything he had if he could get his price, and that his price was $2,000,000. Landes said that the maximum which he was authorized to offer was $1,600,000. Massey then said that he had previously rejected a higher offer. The conversation ended with Landes stating that he would consult his principals and if they were interested he would contact Massey again. Nothing ever came of this transaction.

Upon regaining his strength and recovering his health in May, Massey abandoned any plans that he had about selling United and devoted his full attention to the business of the association. During the months of May through August, 1953, he instituted a program of long range planning in which he increasingly called upon appellant Reynolds for legal

advice on matters affecting the permanent business policies of United. Reynolds' opinion was asked concerning substantially all the forms in current use by United in connection with its deposits and loans, and Reynolds suggested and recommended revisions required by new orders and regulations of administrative boards affecting the conduct of United's business.

Mrs. Mary Kondeff owned 20 shares of stock of United which she desired to sell. She contacted Mr. Massey who told her the stock was worth $200 per share if sold in part or $250 a share if sold in an entire lot. An advertisement was placed in the Glendale News Press offering the stock for sale, but there was no response. An investment broker who was consulted in regard to the price of this stock telephoned United. Mr. Dolan, vice president of United, informed him that he would call back in a short time. When he did call, Mr. Dolan asked who the prospective seller was. After being informed that it was Mrs. Kondeff, he stated that the stock was worth $200 per share if sold in part and $250 per share if sold as a block of twenty. Defendant Massey purchased these shares at $250 per share. They were then divided by lot among all of the directors of United.

In April, 1953 defendant Massey informed appellant that he had purchased 20 shares of stock in the association, the Kondeff stock, at $250 per share, and that he wanted an opinion as to the duties owed by a director to a shareholder from whom he purchased stock in the corporation. In that same conversation Mr. Massey asked if the Anderson stock was for sale and when informed that it was expressed his interest in purchasing it.

In June, 1953 appellant contacted defendant Massey and informed him that the Anderson stock was for sale. Mr. Massey offered $300 a share, but was told the price would be $350 per share.

Shortly after making the Kondeff purchase defendant Massey asked appellant to prepare and submit for the former's guidance, a written opinion dealing with the duties of a director when purchasing shares from a stockholder. During the latter part of June, 1953, appellant handed defendant Massey a memorandum of law dealing with this subject which he referred to as the "Special Facts Opinion," and wherein the rule as enunciated in *Hobart* v. *Hobart Estate Co.*, 26 Cal.2d 412, 432 [159 P.2d 958], was relied upon. Following receipt of the "Special Facts Opinion" defendant

Massey asked appellant to prepare an agreement of indemnification which was to be signed by all of the directors who had purchased the Kondeff shares from him. Massey told Reynolds that he had purchased these shares from Mrs. Kondeff and had resold them to the directors and that under the special facts opinion, he felt that the directors should assume their share of any responsibility if a claim were to be subsequently directed against him in connection with the purchase. Reynolds prepared the agreement and it was given to Massey at a meeting in Reynolds' office on August 3d.

Mrs. Schwartz, administratrix of the estate of Anderson, returned to California on June 1, 1953. Appellant informed her that defendant Massey would probably be willing to pay $350 per share, therefore, she should hold out for that price. He also calculated for her that the asset value of each share was $2,100, but in his opinion getting that was another matter. Appellant testified that, ''I told her that in my opinion, subject to an inquiry that I wanted to make among stockbrokers, that I didn't know of any place where she could get more than $350.00 a share for the stock.'' He suggested that she ''think things over'' and then bring Mr. Hale (decedent Anderson's nephew and Los Angeles County deputy probation officer) in for a conference on this matter.

On July 13, 1953, Mrs. Schwartz and Mr. Hale visited the appellant's office. Mr. Hale asked what the total issue of stock in United amounted to and was informed by the appellant that there were 750 shares. The appellant asked if Mr. Hale had made any inquiries as to the value of this stock. He replied that he had, and had been informed that it was worth $200 a share. The appellant asked if $350 would be considered a good price. Mr. Hale expressed the belief that it would be. The appellant informed them that defendant Massey was interested in the stock. In considering the question of price he pointed out that although the stock was worth a great deal, it was difficult to find a purchaser. In support of this he represented that he had contacted brokerage houses, but they couldn't put much of a value on it. Advertising in trade papers was suggested, and the appellant agreed that this would be wise. The appellant then mentioned that Mr. Massey happened to be in the building, so he went out and brought him back to the office. Defendant Massey expressed an interest in buying and suggested that a meeting be arranged. The appellant at that time pointed out that

he represented both sides. After Mr. Massey departed the appellant stated: "I think I can get $350 a share for you. Now, he may try to offer you less, but you hold out for $350 and I am certain we can get it for you." Later the appellant informed Mrs. Schwartz that he had arranged a meeting with Mr. Massey to discuss the sale of the stock.

Mr. Massey requested Mr. Dolan to prepare figures of the net value of United should it be liquidated. These figures were to be used in his interview with Mrs. Schwartz.

On July 15, 1953, appellant sent letters to four brokerage houses inquiring as to the market value of shares in United. When asked, "Well, you knew, did you not, that in order to determine the price of the guarantee stock, that whoever was making the inquiry would eventually have to get to the Association itself and find out from the Association (United) facts and figures upon which they could determine the stock?" appellant answered, "No, I cannot say that I was consciously aware of that. I am not familiar with the way stockbrokers carry on their business." Appellant further testified, "I knew, generally speaking, that small blocks of stock in closed corporations have no market and in order to find a buyer for such stock, you usually had to go on the company."

"Q. And sell it to them? A. That's right.

"Q. And to determine the value you had to go to the company? A. I would put it to determine what you could get for it.

"Q. You realized, did you not, that the only one that gave out that information from the Association (United) was either Mr. Massey or Mr. Dolan? A. If I had thought about it, I would have known that."

Defendant Massey admitted that anyone desiring to ascertain the value of United's stock would be forced to contact the corporation. All the brokers who were asked for opinions had to go to United for an estimate of the value of the stock.

The appellant took no further steps in order to determine the value of the stock. At no time did the appellant attempt to contact any other buyer for this stock.

On July 16, 1953, the petition to sell the 110 shares of United stock belonging to the estate of Anderson was approved, authorizing the sale of said stock for the minimum price of $22,000 and notice of such sale was dispensed with.

On July 17, 1953, a meeting was held in appellant's office which was attended by Mrs. Schwartz, the appellant and Mr.

Massey. The appellant represented both parties to this proposed sale. That meeting was recorded by a court reporter.

The appellant commenced the meeting by pointing out the necessity of selling the shares of United in order to make a distribution. He asked Mrs. Schwartz if this were not true. She acquiesced. Mrs. Schwartz, the administratrix, testified that she was unacquainted with financial matters; was ignorant of the meaning of "book value," and relied upon the judgment and advice of appellant. All present at the meeting were informed by appellant that he was attorney for both parties to the sale of the stock and that he desired that Mrs. Schwartz who, as administratrix, had a duty to obtain the highest possible price, be free from any criticism on the part of the other heirs. He also pointed out that defendant Massey was obligated to disclose everything to Mrs. Schwartz.

At the meeting appellant stated that he had written to four stock brokers and had received three replies which expressed the belief that the shares had a very limited market and would bring between $200-$250. In this regard the record reflects that on July 15, 1953, appellant communicated with four recognized stock brokers doing business in Los Angeles, asking each one whether there was any present market for the shares; whether an estimate of the price could be obtained; and whether he would be able to sell the shares.

One investment broker valued the shares at $250 and advised an immediate sale at that price if offered. This broker based his estimate of the value of the shares upon the low dividend rate and the fact that the shares were a minority interest. This opinion was given after the broker had secured from Massey a history of the dividends paid, previous sales and Massey's opinion of the value, which he stated was in excess of $250 per share. In making his determination of value, this broker considered the lack of a current market for the shares, the financial condition of United as reflected by its June 30th balance sheet, and the book value of all the shares as being in the neighborhood of $2,000 per share.

Another broker also found that there was no market for the shares. He learned from Kline M. Dolan, vice president and secretary of United, the amount of royalties previously paid; that recent transactions in the shares were at the $240 to $250 price level; and he informed Reynolds that the market appeared to be restricted entirely to other holders of the stock.

The third stock broker told Reynolds that his organization was not interested in the inquiry; and the fourth broker wrote

that $230 was the market price per share and that there was no ready market for the stock.

Appellant stressed that a purchaser had to be searched for, at the same time pointing out that Mr. Massey, as the president or director and substantial stockholder of United, was naturally interested in acquiring more stock, and had offered $350 per share.

Defendant Massey then expressed his desire to fully explain all the pertinent facts about United. This disclosure included revealing the total assets of United, an offer to purchase United at $1,400 per share made in April of 1952. No mention was made of any other offers. Even though two were known to the appellant, he made no comment in regard to the second offer. It was represented that the book value of United was about $2,600 per share, but this could only be realized if some one purchased United in its entirety. Defendant Massey denied that at that time any one was negotiating for such a purchase. He did not mention the discussions which were at that time taking place between himself and Mrs. Cook in regard to the purchase of United. Mr. Massey pointed out that a second way to realize the book value of the stock would be to sell the assets of United, which was not contemplated. A third method would be to liquidate United, but this would mean a drastic reduction in the value received for each share. Mrs. Schwartz was further told that United stood to lose between $150,000 and $250,000 on one transaction in which it was involved.

Defendant Massey told of the past sales of stock for $116 in 1947 through the purchase of 20 shares at $250 per share in May of 1953. The appellant was interested in knowing if all of the sales mentioned were at arm's length. He was assured that they had been of such a character.

The dividends paid over the past years were discussed culminating in the statement that United had declared a 6 per cent per annum rate for the first half of 1953 and that in his opinion the dividends for the entire year of 1953 would be the same as in 1952. That no larger dividend was contemplated because of a fear that it would jeopardize the reserve requirements of the corporation.

Defendant Massey then stated that due to the facts stated and the ''uncertainty of the future economic conditions of the country and the mortgage business'' he could only offer $350 per share.

Appellant then called attention to the fact that the par value of the stock was only $11,000. That, as the dividend of 10 per cent was paid on the basis of par, the administratrix would realize a very small percentage of income on the $38,500 offered for the stock. He pointed out that the 110 shares was a minority block of stock and- thus worth less than majority stock. He gave it as his conclusion that the stock would be worth only what was offered for it irrespective of the information supplied by defendant Massey. The record reflects that at the meeting appellant said, "Of course, you could keep the stock, Mrs. Schwartz. You could divide the stock up, but I don't suppose all your heirs in the Midwest would want it, would they? They would rather have the money; isn't that right?" to which Mrs. Schwartz replied, "Yes, I think Mr. Massey would want it that way." Defendant Massey then said, "We would want it that way." Mrs. Schwartz then volunteered, "To stay in the State of California in the place of sending it out to the heirs," and defendant Massey said, "Oh, yes, that is natural." Appellant then said, "Of course, he (Massey) would rather have it that way, but of course, your duty is to your heirs, to do the best you can."

Mrs. Schwartz then informed appellant and defendant Massey that her nephew (Mr. Hale) had made an investigation into the matter, but his only inquiry was made to a man in Glendale, 81 or 82 years old, who formerly was a stock broker, but at the time of the inquiry was operating a gas station and washing automobiles, and who placed the value of the stock at "Between $200 and $250" per share.

- Appellant pointed out that if one retained the stock until the company was sold or liquidated they would probably receive much more for it, "provided we don't run into a depression or something which you never can tell about." When Mrs. Schwartz expressed her belief that there would be no depression, the appellant replied that conditions in the building line had been good for a long time and that he and Mr. Massey had discussed the possibility of business going bad. Mr. Massey then stated that all the periodicals indicated that the market was softening and was being fostered by the federal government.

The record contains evidence that appellant and defendant Massey were aware that United was "making a lot of money," but its profits were never discussed with Mrs. Schwartz. The latter testified that she was furnished with

a copy of the June 30th report of United, but that she relied upon the representations made to her at the foregoing conference.

On July 21, 1953, a regular meeting of the board of directors of United was held but defendant Massey did not disclose the availability of the 110 shares belonging to the Anderson estate. A transcript of the meeting of July 17th was furnished to the administratrix, Mrs. Schwartz, and she endorsed two certificates of United, evidencing ownership of a total of 110 shares of stock in United, and also signed the letter granting permission to sell. Although there was other stock in the estate of Anderson that was to be sold, appellant obtained no special authority for its sale. Appellant testified, ''And if my memory serves me right, I called him (defendant Massey) on the telephone immediately and said, 'She will take $350.00 a share.' ''

On July 23, 1953, Mr. Shaw sponsored a press preview party for newspaper reporters, publicity people and members of various building and loan associations in the Los Angeles area in order to publicize his La Mirada development where he was contemplating the construction of several thousand homes. Prior to this time, during an illness of defendant Massey, Mrs. Cook paid him a visit to inquire as to how he was progressing in the recovery of his health. At this visit there was some informal discussion in which defendant Massey asked Mrs. Cook if Harold Shaw, whom she represented, would like to purchase United. Mrs. Cook replied that she did not know but inquired as to the price, to which Massey replied, ''. . . one or two million dollars. . . .'' No discussion was had as to terms or details. Sometime later Mrs. Cook mentioned to Mr. Shaw this talk she had had with defendant Massey, and subsequently, Mrs. Cook told Massey that she had talked to Shaw and that she had given him the price, not accurately, ''A million or two million dollars''; that it might be a good investment; that it was a lot of money; that Shaw was interested if he could buy the controlling interest in United; and that he had said that she should go ahead and see what could be done.

Massey asked Mrs. Cook to have Shaw put his thoughts in writing; nothing was ever done about this suggestion; nothing was ever said about the preparation of a proposal, nor was any suggesetion ever made for a meeting between Shaw and Massey to discuss the subject.

At the aforesaid press preview party defendant Massey

asked Mrs. Cook if she had discussed the sale with Mr. Shaw and if he was interested in buying. Both questions were answered in the affirmative. According to the testimony of Mr. Shaw, on one occasion when defendant Massey met him at the party, the following ensued: "He said, 'How about buying my United Savings & Loan Association?' I said, 'Look, Mr. Massey, we don't talk business on this type of day. This is a day of entertainment.' Well, he said, 'Frankly we can get together if you want to talk about it.'"

On July 28th or 29th, 1953, Mrs. Schwartz, administratrix of the estate of Anderson, notified appellant that she was returning to her home in Ohio.

On or about July 31, Mrs. Cook came to defendant Massey's office pursuant to a previous appointment and announced to Mr. Dolan, vice president and secretary of United, that she had come to purchase the corporation. Mrs. Cook testified that upon the arrival of defendant Massey, "I told him that Mr. Shaw was looking for other Associations to buy, and that he wanted some sort, of an expression about the United Savings. . . ." Defendant Massey said that for a "personal reason" there would be a delay of about 30 days and that he desired to contact the board of directors. Mrs. Cook also again advised Massey that she represented Shaw and that if Shaw purchased United, she was to be chairman of the board; that Mr. Dolan would be manager; that the other directors would be retained, and that she assumed Massey would retire. Defendant Massey requested Mrs. Cook to refrain from discussing the sale with anyone connected with United and to cancel a personal engagement with Mr. and Mrs. Dolan.

On August 3, 1953, defendant Massey instructed Mr. Dolan to break a dinner engagement with Mrs. Cook at Mr. Shaw's home, as Mr. Massey wanted to handle the negotiations for the sale of United personally.

The appellant was informed by Mr. Massey that he was prepared to proceed with the purchase of the stock. It was then that Mr. Massey was told that the appellant's fee for his work in arranging and handling this sale (of the estate stock) would be $5,000. Mr. Massey stated, "That seems high but if that's your charge, I won't question it. You will have to come out and sell it to the boys." The legal fee was to be apportioned among the shares on a proportionate basis. The appellant was unable to attend that meeting so he asked Mr. Painter (appellant's law partner) to go for the

purpose of explaining the fee. Mr. Painter admittedly did not know the work done in connection with which the fee was charged.

On the evening of August 4, 1953, an informal meeting of all of the directors of United was held. Mr. Painter was also present at this meeting. Mr. Massey read the legal opinion of the appellant which dealt with the aforesaid "Special Facts Doctrine." Next he read in its entirety the transcript of the meeting of July 17. After reading the transcript Mr. Massey announced that he intended to purchase 80 of the 110 shares in the estate at $350 per share and that the remaining 30 shares could be divided among the other directors, each being allotted five shares. In the event the other directors did not choose to purchase the stocks he personally would acquire them.

Defendant Massey also informed the directors that in addition to the price of $350 per share they would be obliged to pay $5,000 in attorney's fees to appellant for his services in connection with this transaction. This fee was to be pro-rated and would amount to approximately $45.45 per share, thereby bringing the total cost per share to 395.45. There was testimony that two of United's directors regarded appellant's charge as a "rather large fee." However, defendant Massey informed the directors that he had been approached by Mrs. Cook who represented a client, Mr. Shaw, who was interested in purchasing United. Mr. Massey stated that he had informed Mrs. Cook that United was not for sale, but if she wanted to talk to him about it, she would have to contact him later.

There was a discussion as to whether or not an offer had in fact been made and as to whether or not it had any merit. Certain directors expressed the view that information of this offer to purchase should be conveyed to Mrs. Schwartz. Mr. Painter was asked to inform Mrs. Schwartz of this offer. He replied that this information would be transmitted to Mr. Reynolds or to Mrs. Schwartz. After the meeting Mr. Massey told Mr. Painter that there was nothing to the Cook offer to purchase United. When Mr. Painter left the meeting he had the names of the purchasers of the stock and their respective amounts thereof. Each of the directors agreed to take their five shares.

At this meeting the indemnity agreement which the appellant had prepared in connection with the previous Kondeff purchase at Mr. Massey's request was signed by the directors.

Subsequent to August 4, defendant Massey assured Mr. Irvin, one of the directors of United, that Mrs. Schwartz, administratrix of the Anderson estate, had been informed of Mrs. Cook's offer and that the former was satisfied. This conversation between Massey and Irvin was received over the objection of appellant that since he was not present thereat, the conversation as to him was hearsay and therefore, incompetent, irrelevant and immaterial. We are satisfied the objection was properly overruled. ■ While it is true that the fact of a conspiracy cannot be proved by evidence of extrajudicial statements of a coconspirator (*People* v. *Doble*, 203 Cal. 510, 517 [265 P. 184]), nevertheless, for the purpose of permitting introduction of evidence of the extrajudicial acts and declarations of a conspirator, the conspiracy need be proved only to the extent of producing prima facie evidence of the fact (*People* v. *Sica*, 112 Cal.App.2d 574, 583 [247 P.2d 72]; *People* v. *Frankfort*, 114 Cal.App.2d 680, 699 [251 P.2d 401]). It need not be established by a preponderance of the evidence as in a civil action, nor beyond a reasonable doubt as in a criminal action (*People* v. *Steccone*, 36 Cal. 2d 234, 238 [223 P.2d 17]). In the instant case we are satisfied that under the aforesaid rules, the existence of a conspiracy was sufficiently established to permit a. consideration by the trier of facts of the acts or declarations of a conspirator to the end of proving the ultimate guilt of the crime charged (*People* v. *Talbott*, 65 Cal.App.2d 654 [151 P.2d 317]).

On August 5th Attorney Painter, appellant's law partner, informed the latter of what had transpired at the meeting of United's directors on the previous evening. In this regard Attorney Painter testified, in part, as follows: ". . . I said to him that an inquiry had been made by one of the gentlemen present as to whether this was one of the types of matters which should be reported to Mrs. Schwartz, and I told him that I did not know whether it was or not, that I would take it up with him and I think it was after I said that, he said 'Well, I see nothing in that incident that I think should be taken up with her.' " On August 5, 1953, appellant wrote each director confirming the sale and advising them of the formalities to be followed in completing the same. On August 7th, 10th and 11th, 1953, directors Massey, Irvin, Rice, Hawley and Gross, respectively forwarded their checks to cover the purchase price of their stock plus their pro-rata share of appellant's $5,000 fee.

On August 19, 1953, appellant forwarded the endorsed certificate for 110 shares held by the Anderson estate to United with instructions to "issue new certificates in the names of the seven directors."

On August 20, 1953, pursuant to a previous telephone call to Mrs. Cook, the latter, accompanied by John Moore Robinson called upon defendant Massey at United's office. Mr. Robinson identified himself as Mr. Shaw's representative. Mr. Massey said that, because of a tax problem resulting from the recent acquisition of his mother's stock within the last six months he was unwilling to sell. Mr. Robinson assured him that some arrangement for future purchase of this stock could be arranged. They then discussed the personnel of the organization. The price was discussed, and it was agreed that it would be the adjusted book value. Certain rights which Mr. Massey desired were to be retained by him personally, that is, certain escrow business, insurance business, and the brokerage business.

Later that evening, defendant Massey and United directors Rice and Dolan had dinner together. Concerning this meeting Mr. Dolan testified, "During the course of the dinner he (Massey) told us in his own words of his discussion with Mr. Robinson and Mrs. Cook; that he felt after this talk that they were sincerely interested in the purchase of the stock, providing the majority of the stock could be delivered; and they had discussed the matter to some detail and that a letter would be submitted from Harold Shaw, as I recall, stating that they were definitely interested in the purchase if he could deliver the majority of the outstanding stock."

On August 21, 1953, defendant Massey visited Mr. Robinson at the latter's office and inquired as to the manner in which the stock he had received from "his mother" would be processed. A reverse option arrangement was settled upon. There was then a further discussion of the rights to be retained by Mr. Massey. It was agreed that the appellant should draw the documents involved in the transfer. Mr. Massey was confident he could deliver a majority of the stock, but desired a letter which would outline the offer to present to the other shareholders.

Mr. Massey signed the new stock certificate transferring the Anderson estate stock in United to himself and the other directors. Mr. Dolan mailed all of the new certificates to the appellant.

On August 24, 1953, Mr. Robinson (Shaw's representative)

wrote the letter requested by defendant Massey at the meeting of August 21st and it was delivered to Massey by Mrs. Cook.

About August 31, 1953, defendant Massey contacted Dr. Rice, one of United's directors, asking him if he would contact some of the shareholders who were doctors and friends of his and tell them that ". . . we had a prospective sale. I wasn't sure whether it was definite but to see whether or not they would be interested if it was a very substantial sum. I spoke to Mr. Dolan (vice-president and secretary) of United and I forgot whether I contacted the other directors or he did."

On August 25th, defendant Massey called the appellant and asked him to begin preparing the necessary papers for the sale of United. It was agreed that the appellant should receive $50 per share transferred, as his fee for handling the transaction.

The appellant and Mr. Massey went to Mrs. Cook's office where they met Mr. Robinson, Mrs. Cook and Mr. Shaw. The parties discussed the arrangements for the sale which had already been threshed out in detail at the other meetings. The appellant was there merely to take notes so that he could draw the final contract.

On August 26, 1953, appellant received a list of those shareholders who were prepared to go ahead with the sale of United to Mr. Shaw, and on August 28, 1953, appellant wrote Mrs. Schwartz, administratrix of the Anderson estate, informing her that defendant Massey had purchased the estate stock of 110 shares at $350 per share but did not inform her of defendant Massey's subsequent sale at $2,800 per share.

On September 9, 1953, the stockholders of United approved the sale and the contracts were signed by the interested parties. On September 25, 1953, the escrow was closed and the transaction completed. Five hundred and seventy-four shares of United were transferred to the Shaw group at $2,800 per share, including the 110 shares formerly owned by the Anderson estate, and as heretofore noted, purchased from said estate for $350 per share.

On September 28th, and again on October 8th, appellant wrote Mrs. Schwartz, administratrix of the Anderson estate, but did not disclose to her the sale of United to the Shaw group.

In the month of October, 1953, while appellant was in New York, his law partner, Mr. Painter, contacted him and informed him of the fact that the validity of the sale of the

Anderson estate stock was being questioned. That a report of the purchase at a low price and subsequent sale at a very high price had been made to the probate court and a claim was being made that the stock was procured from the estate by some form of fraud.

The appellant immediately called Mrs. Schwartz. He told her that Mr. Massey had sold the stock for "quite a sum of money," but did not specify the exact amount. In answer to her inquiry as to what could be done, Mrs. Schwartz testified as follows: "I asked him what I could do; and he said 'Nothing,' because I told him I didn't want another trip out here."

During the early part of November, 1953, Mr. Peters, a state inheritance tax appraiser, contacted appellant and informed him that in the light of information that the stock had been sold for $2,800 a share, the appraisal of the association stock in the Anderson estate should be corrected. The appellant agreed that the stock was worth more than the appraised value but inquired whether the fact that it was a minority interest would not decrease its appraisal. The appellant also requested permission to submit evidence of the true evaluation in the form of letters which he had received from various stock brokers and also offered to supply the statement of July 17th.

On November 23, 1953, appellant wrote Mrs. Schwartz, but did not disclose the price at which United was sold.

During the latter part of November, 1953, appellant contacted Mrs. Cupp, a probate court investigator, who told him that from the facts available it appeared as if Mr. Massey had defrauded Mrs. Schwartz. That in the light of these facts Mr. Hale had been advised to contact an attorney to look into the matter. The appellant next called Mr. Hale and was informed that Attorney Warner had been retained as counsel.

On December 3, 1953, appellant met Mr. Warner and Mr. Laybourne who were the attorneys for the heirs of the Anderson estate. They informed him that they could prove that Mr. Massey had perpetrated a fraud on Mrs. Schwartz by concealing the planned sale to the Shaw interests. Further, the appellant was told that an action against him was being contemplated. When asked concerning when he first learned of the Shaw negotiations, the appellant did not answer, but merely stated that Mr. Massey had lied to him.

Defendant Massey was informed by the appellant that he could no longer represent him in this matter.

On December 2, 1953, appellant telephoned Mrs. Schwartz, administratrix of the Anderson estate, at her home in Ohio. On December 3, 1953, after Mr. Warner, one of the attorneys for the heirs in the Anderson estate, contacted him, appellant again telephoned Mrs. Schwartz. On December 9th and 21st, he also telephoned her. In one of these telephone conversations appellant asked Mrs. Schwartz to help him for ''They're after me.'' He then stated that she was the only person who could save him. When asked why they were after him, he replied, ''It's over that stock''; that they had made quite a bit of money on it. With regard to the telephone conversations Mrs. Schwartz testified appellant said, '' 'If I send you a letter will you answer the letter back' and I told him no, he didn't need me when he made that deal, he didn't need me then.'' In answer to a question, ''. . . was there anything said as to what should be put into this letter that Mr. Reynolds (appellant) asked you for?'' Mrs. Schwartz testified, ''Well, he said he would write me a letter and then for me to copy it and send it back to him . . . I told him no, because I didn't know nothing about it.'' In answer to the question ''Well, did he say to you in words that he wanted you to write him a letter that you knew about the deal?'' the witness answered, ''Yes, he did but I couldn't because I didn't know nothing about the deal.''

On recross-examination with regard to the letter requested from her by appellant, Mrs. Schwartz was asked, ''He asked you to write him a letter to confirm the fact that he had mentioned that (the sale of the stock) to you in October, that was all?'' the witness replied, ''Well, I just don't remember.'' When defendant Massey was informed of the Anderson estate's dissatisfaction with the sale of the stock he wanted to refund all of the money that was due the estate.

On December 19, 1953, Mrs. Schwartz resigned as administratrix of the estate of Anderson, and on January 12, 1954 Russell Hale, a nephew of decedent and a deputy Los Angeles County probation officer, was named administrator.

In February, 1954, Mr. Hale, in his capacity as administrator of the Anderson estate, filed a petition in the probate court asking authority to sue defendant Massey, appellant Reynolds and the directors of United for rescission and damages arising out of the sale of the Anderson shares in United.

The matter of the settlement of the threatened litigation was

discussed by the directors of United and appellant's counsel was told that no compromise of the Anderson estate litigation would be made unless the law firm of which appellant was a member, contributed the sum of $25,000 to defray the legal expenses of the directors in connection with such litigation.

On February 27, 1954, defendant Massey and the directors of United entered into a written compromise agreement with the law firm of Reynolds, Painter and Cherniss, which provided: (1) that defendant Massey and the directors settle the litigation with the administrator of the Anderson estate by exercising the reverse option clause and directing the proceeds therefrom to be disbursed so that the estate would receive $2,800 per share for its 110 shares; (2) that Reynolds, Painter and Cherniss be released and discharged from all claims and demands in connection with the sale; upon condition (3) that Reynolds, Painter and Cherniss pay to Massey and the directors the sum of $25,000. Prior to the payment of this $25,000 appellant had "heard by rumor" that the matter had been referred to the office of the district attorney of Los Angeles County.

Concurrently with the execution of the compromise agreement just referred to, a settlement was effected between defendant Massey and Mr. Hale, as administrator of the Anderson estate, under which the latter received the difference between the price of $350 per share paid to it for the sale of its 110 shares to defendant Massey and the other directors of United and $2,800 per share which was realized from the sale of said shares, as aforesaid, to the Shaw interests.

As his first ground for reversal, appellant urges that the indictment does not state facts sufficient to constitute a public offense.

The indictment charges that the defendants:

". . . did wilfully, unlawfully and feloniously take personal property of a value in excess of $200.00 lawful money of the United States, the personal property of the Estate of Charles A. Anderson, deceased . . . and Helen Schwartz, Administratrix of said estate. . . ."

The gist of appellant's challenge to the sufficiency of the indictment is thus stated by him: "The fatal defect in the indictment consists in its failure to describe the property which the defendants are accused of taking. It is our contention that an indictment for theft must describe the property, otherwise it is totally insufficient, and that the mere general allegation in the indictment herein, accusing the

defendants of taking personal property of a value in excess of $200.00, the personal property of the estate, and of the administratrix, is no description at all.''

When it is remembered that the sufficiency of the indictment is not to be tested by the rigorous rules of the common law, nor by the rules existent in this state prior to the 1927 and 1929 amendments to our statutes governing pleadings in criminal cases, appellant's attack upon the pleading herein cannot be sustained.

The sole purpose of an indictment or information is simply to inform the accused of the charge which he must meet at the trial (Pen. Code, § 952). As was said in *People* v. *Beesly,* 119 Cal.App. 82, at page 85 [6 P.2d 114, 970] : ''There, in a nutshell, is stated the principle of our present simplified form of pleading a criminal offense — the accused is entitled to notice of the offense of which he is charged but not to the particular circumstances thereof, . . .''

Where this information came solely from the indictment, as at common law, more particularity was required, but under our system, the law now provides, as part of the accusatory procedure, that in every criminal case the accused is entitled to a transcript of the testimony given before the grand jury or the committing magistrate, as the case may be (Pen. Code, §§ 870, 925). See also *People* v. *Pierce,* 14 Cal. 2d 639, 645 [96 P.2d 784] ; *People* v. *Gilbert,* 26 Cal.App.2d 1, 7, 8 [78 P.2d 770] ; *People* v. *Roberts,* 40 Cal.2d 483, 486 [254 P.2d 501] ; *People* v. *Weiss,* 123 Cal.App.2d 487, 491 [266 P.2d 924] ; *People* v. *Elliott,* 115 Cal.App.2d 410, 416 [252 P.2d 661] ; *People* v. *Schoeller,* 96 Cal.App.2d 61, 64 [214 P.2d 565] *People* v. *Longo,* 119 Cal.App.2d 416, 418 [259 P.2d 53] ; *People* v. *Jones,* 61 Cal.App.2d 608, 615 [143 P.2d 726] ; *People* v. *Curtis,* 36 Cal.App.2d 306, 317 [98 P.2d 228] ; *People* v. *Yant,* 26 Cal.App.2d 725, 730 [80 P.2d 506].)

Penal Code, section 952, provides in part that an indictment or information is sufficient ''. . . if it contains in substance, a statement that the accused has committed some public offense therein specified. . . . It may be in the words of the enactment describing the offense or declaring the matter to be a public offense, or in any words sufficient to give the accused notice of the offense of which he is accused. In charging theft it shall be sufficient to allege that the defendant unlawfully took the labor or property of another.'' The quoted words mean what they say, and viewed in the light thereof, we are satisfied the indictment herein is not vulnerable

to the stricture imputed to it by appellant. (*People* v. *Corenevsky*, 124 Cal.App.2d 19, 23 [267 P.2d 1048] ; *People* v. *Howes*, 99 Cal.App.2d 808, 816 [222 P.2d 969] ; *People* v. *Blankenship*, 103 Cal.App.2d 60, 62 [228 P.2d 835] ; *People* v. *Dunn*, 40 Cal.App.2d 6, 12 [104 P.2d 119].)

We are not in accord with appellant's contention that the provisions of Penal Code, sections 952 and 967, are in conflict and that the former cannot constitutionally authorize the indictment herein (Cal. Const., art. I, § 8) because of the provisions of the latter code section. We regard both sections as a legislative declaration of permissible modes of pleading and as complementary to rather than irreconcilable with each other. When these two sections are read together they do no violence, in the instant case, to the basic rule that the purpose of an indictment or information is to inform the accused of the charge which he must meet at the trial, while the particular circumstances thereof were furnished him by the transcript of the testimony upon which the indictment was founded.

Our conclusion is fortified by reference to Penal Code, section 960, which provides: "No accusatory pleading is insufficient, nor can the trial, judgment, or other proceeding thereon be affected by reason of any defect or imperfection in matter of form which does not prejudice a substantial right of the defendant upon the merits."

As was said in *People* v. *Howes*, *supra*, at page 816: ". . . It is also the law that even a defective information or indictment will not result in a reversal unless a substantial right of the defendant on the merits is adversely affected. (Citing cases.)"

It is elementary that an appellant must not only show error but that such error prejudiced his substantial rights and militated against his receiving a fair trial. In the case at bar, appellant has not suggested how under any possible concept of the record he was in any way prejudiced by the form of the indictment herein. At no time in the trial court did he attack the indictment and his conduct during the trial showed he was at all times cognizant of the offense charged against him and of the particular details thereof—all of which he was apprised of by the grand jury transcript furnished him at the time of his arraignment.

Finally, appellant contends that the decision of the court and the judgment are contrary to and without support in the evidence, and are contrary to the law.

As we enter upon a discussion of this contention we are confronted with the well established rule as announced in *People* v. *Newland,* 15 Cal.2d 687, 681 [104 P.2d 778], that before the court on appeal can set aside the verdict or decision arrived at by the duly constituted arbiter of the facts upon the ground of insufficiency of the evidence, " 'it must be made clearly to appear that upon no hypothesis whatever is there sufficient substantial evidence to support the conclusion reached in the court below. . . . We must assume in favor of the verdict (or decision) the existence of every fact which the jury (or in the instant case, the trial judge) could have reasonably deduced from the evidence, and then determine whether such facts are sufficient to support the verdict.' If the circumstances reasonably justify the verdict of the jury, the opinion of the reviewing court that those circumstances might also reasonably be reconciled with the innocence of the defendant will not warrant interference with the determination of the jury. (Citing cases.)"

It is the trier of fact who must be persuaded beyond a reasonable doubt of the guilt of the accused. Our function is to determine whether there is evidence, contradicted or uncontradicted, which, if believed, is of sufficient substantiality to justify conviction (*People* v. *Dragoo,* 121 Cal.App.2d 322, 324 [263 P.2d 90] ; *People* v. *Bass,* 110 Cal.App.2d 281, 283 [242 P.2d 685] ; *People* v. *Falk,* 113 Cal.App.2d 857, 860 [249 P.2d 60]).

Appellant relies heavily on the case of *People* v. *Nichols,* 52 Cal.App.2d 31 [125 P.2d 513], decided by this court and wherein a judgment was reversed on the ground "of the insufficiency of the evidence." In the case just cited however, the court set forth the limited power of an appellate tribunal under the rules above enunciated, and then said, at page 35, "But it is axiomatic as well that an appellate court may set aside the findings of the trial court when there is no substantial or credible evidence in the record to support them, or where the evidence relied upon by the prosecution is apparently so improbable or false as to be incredible, or where it so clearly and unquestionably preponderates against the verdict or decision as to convince this court that its rendition was the result of passion or prejudice upon the part of the trier of facts. *When a case presents any of these features this court deals with it as a matter of law.*" (Emphasis added.) It was then pointed out that "In the case now before us the prosecution introduced no positive, direct or affirma-

tive evidence on any material issue." Under the facts of the case at bar, we do not consider the Nichols case as militating against any of the established rules herein set forth and under which we must approach the rendition of a decision herein as to appellant's claim of insufficiency of the evidence to justify his conviction.

While the indictment did not specifically charge appellant and defendant Massey with the crime of conspiracy, the theory of the prosecution throughout the trial was that appellant and his codefendant had conspired to commit grand theft.

In this state it is now settled law that a conspiracy need not be pleaded in an indictment or information if the evidence actually shows the existence of one (*People* v. *Tanner*, 3 Cal.2d 279, 299 [44 P.2d 324] ; *People* v. *Whelpton*, 99 Cal. App.2d 828, 832 [222 P.2d 935] ; *People* v. *Anderson*, 35 Cal. App.2d 23, 29 [94 P.2d 627]).

A conspiracy is established when it is shown that there was an agreement between two or more persons to commit a crime and that an act was done in California to effect the object of the agreement (Pen. Code, §§ 182, 184; *People* v. *Buffum*, 40 Cal.2d 709, 715 [256 P.2d 317]). A conspiracy cannot be established by suspicion or mere association of the parties. There must be evidence of some participation or interest in the commission of the offense, as well as guilty knowledge of the formation and existence of a common unlawful design (*People* v. *Long*, 7 Cal.App. 27, 33 [93 P. 387] ; *People* v. *Linde*, 131 Cal.App. 12, 20 [20 P.2d 704] ; *People* v. *Rodriguez*, 37 Cal.App.2d 290, 295 [99 P.2d 363] ; Underhill, Criminal Evidence, 4th ed., § 773, p. 1401).

Direct evidence is not required to establish a conspiracy, but circumstantial evidence may be relied upon. This rule is sanctioned for the obvious reason that experience has demonstrated that as a general proposition a conspiracy can only be established by circumstantial evidence. " '. . . it is not often that the direct fact of an unlawful design which is the essence of a conspiracy can be proved otherwise than by the establishment of independent facts, bearing more or less closely or remotely upon the common design (5 Cal.Jur. 521) ; and it is not necessary to show that the parties met and actually agreed to undertake the performance of the unlawful acts (citing authority), nor that they had previously arranged a detailed plan . . . for the execution of the conspiracy (citing authority).' (*People* v. *Sampsell*, 104 Cal.App. 431, 438-439 [286 P. 434].)'' (*People* v. *Steccone, supra*, p. 238.)

From the very nature of the stealth generally involved in the crime of conspiracy, it is not necessary to prove that the parties came together and reached a formal agreement (*People* v. *Campbell*, 132 Cal.App.2d 262, 267 [281 P.2d 912]). In cases such as the one now engaging our attention, involving as it does, the claim of a conspiracy to defraud, it can hardly be expected that direct evidence of such a conspiracy can be obtained because such evidence could ordinarily be secured only in the event one of the conspirators admitted guilt. The judge herein was therefore, entitled to infer the existence of a conspiracy from all the circumstances proven, and if the inference is a reasonable one it will not be disturbed on appeal. In *Revert* v. *Hesse*, 184 Cal. 295, 301 [193 P. 934], our Supreme Court, quoting from a Georgia case, said: " 'The law recognizes the intrinsic difficulty of proving a conspiracy. The allegations with reference to conspiracy are treated as matters of inducement leading up to a more particular description of the acts from which conspiracy may be inferred. . . . *The conspiracy may sometimes be inferred from the nature of the acts done, the relation of the parties, the interests of the alleged conspirators, and other circumstances.*' " (Emphasis added.) And in *People* v. *Fratianno*, 132 Cal.App.2d 610, 624 [282 P.2d 1002], we find the following language: ". . . the purpose of the evidence in conspiracy cases is to establish a mental state—an illicit concord of minds of several persons. The jury is entitled to consider every fact which has a bearing on the ultimate fact in issue. There is no valid objection to evidence which tends to show, step by step, the gradual formation of a criminal concord in the minds of those accused, merely because the evidence begins at a time long anterior to the wrongful meeting of the minds. 'It is necessary only that the evidence, in all its parts, tends to prove the formation of the conspiracy . . . "From the nature of the crime itself it is difficult to prove a criminal conspiracy by direct evidence, and such conspiracies are almost always proven by circumstantial and 'piecemeal' evidence" . . .' (*People* v. *Stevens*, 78 Cal.App. 395, 407 [248 P. 696]. See *Allen* v. *United States*, 4 F.2d 688.)"

While, as heretofore stated, mere association with the perpetrator of a crime is not sufficient to prove a criminal conspiracy and there must be evidence of some participation or interest in the commission of the offense (*Dong Haw* v. *Superior Court*, 81 Cal.App.2d 153, 158 [183 P.2d 724]), nev-

ertheless, when it is shown that a conspiracy is already in existence, a different situation may arise and evidence of a close association and constant contact is not totally irrelevant, if it tends to show that by reason of such association acts, apparently disconnected, are shown to have some relation to and are being committed in relation to and in furtherance of the conspiracy (*People* v. *Griffin*, 98 Cal.App.2d 1, 39 [219 P.2d 519]).

 It is equally well settled that after a conspiracy to commit an unlawful act is established, every act of each member of the conspiracy in furtherance of their original plan is in contemplation of law the act of all of them (15 C.J.S., p. 1105, § 74; *People* v. *Creeks*, 170 Cal. 368, 374 [149 P. 821]; *People* v. *Stoddard*, 48 Cal.App.2d 86, 89 [119 P.2d 160]; *People* v. *McManis*, 122 Cal.App.2d 891, 900 [266 P.2d 134]).

In the instant case the record reflects that appellant and his codefendant were intimately associated. The former was not only counsel for United, but for defendant Massey personally, and at the time of the negotiations for and consummation of the sale of the stock of the Anderson estate, appellant was attorney for the administratrix of said estate. He was fully aware that defendant Massey was constantly interested in purchasing stock in United, indeed, the appellant knew that Mr. Massey had talked to the late Mr. Anderson concerning the purchase of the Anderson stock. He also admits knowledge of at least two recent offers to purchase United at a price far in excess of that paid for the estate shares, but cannot recall whether or not he was informed of any other offers to purchase United. Upon the death of Mr. Anderson in September of 1952, he was aware that Mrs. Schwartz, who was appointed administratrix, was not a resident of this state, but that a nephew of decedent was such a resident and employed in the probation office of Los Angeles County, yet appellant prepared the documents necessary to procure the appointment of Mrs. Schwartz, advising her she could claim the Anderson home in Los Angeles as her residence address and that mail in connection with the estate could be forwarded to her home in Ohio. It is not unreasonable to say that the trial judge was justified in drawing the inference that appellant's interest in having a nonresident administratrix appointed who was without knowledge of financial matters and removed from the local scene was that she would be more easily influenced to follow appellant's recommendations as to sale of the stock than one who resided in

the locale in which the estate was administered. After Mrs. Schwartz was appointed administratrix and returned to her home in Ohio, appellant forwarded to her the documents in the estate which required her signature and upon their return, notarized those signatures.

Sometime between Mr. Anderson's death and the end of 1952 Mr. Massey admittedly communicated to appellant his interest in purchasing the Anderson stock, but it was not until the beginning of March that Mrs. Schwartz was informed of this. Mrs. Schwartz was told that United had a buyer for the stock at $200 per share. "It may be worth more" he stated, "but recently however, things have not been quite so good in the line of business." The court was warranted in inferring that the purpose of this letter was to impress upon Mrs. Schwartz the wisdom of accepting such an offer as an inducement to influence her subsequent decision to accept $350 which offer appellant knew he could obtain from his codefendant Massey. Mrs. Schwartz however, was reluctant to accept the proffered offer of $200 per share until an effort was made to find another buyer at a better price. Appellant made no effort to locate another buyer though he knew at least two persons, Mr. Ahmanson and Mr. Metz, who had been interested in purchasing stock of United. It seems only reasonable to infer that they might have been interested in obtaining a block of 110 shares of the 750 of United. With reference to the $350 offer for the estate stock, appellant was asked, "But in so far as you were concerned, when you in your mind came to this figure of $350.00, essentially you knew that there had been a batch at some time in the past that sold for $300.00, and you reached up in thin air and grasped the figure of $350.00; is that it?" His answer was, "I would say that is approximately it." He further testified that the figure of $350 was based upon prior sales and "what I thought those directors would pay" since defendant Massey had purchased stock at $250 per share after attempts had been made to sell it elsewhere, "that $300.00 was the highest price that it had ever brought, and I thought that going up another $50.00 was about as much as they would stand." It is significant, to say the least, that the price offered by defendant Massey was $350, the exact price appellant advised Mrs. Schwartz to hold out for. In discussing the price with Mrs. Schwartz, the administratrix, appellant advised her that the asset value of the stock was $2,100 per share, but to obtain that sum was another question. Appellant's opinion was that $350 was

the top price which could be obtained. While appellant stated that he made inquiries of various brokers, he conceded that these brokers, in order to determine the value of the stock, would have to go to United. On July 16th, the day before the conference between appellant, defendant Massey and Mrs. Schwartz, defendant procured authorization to sell the stock. The meeting on the following day evidenced the concert of action between appellant and his codefendant. At the outset of this meeting appellant urged upon the administratrix the necessity of selling the stock in order to make distribution in the estate. He then advised her that the aforesaid inquiry of brokers resulted in information that the stock was worth between $200 and $250 per share, but that there was no market for the stock. Defendant Massey then entered the discussion. He informed Mrs. Schwartz that United had total assets of $37,119,165.53 and described them. Roughly he said, the book value of each share was $2,600. But, he told her, "book value" could only be realized if (1) United were sold, (2) the assets of United were sold, or (3) that United was liquidated. He further stated that many deductions would have to be made in order to arrive at a true value, in the event one of these three alternatives developed, which was much less than indicated.

*Defendant Massey represented that there were no negotiations pending for the sale of United when in fact at this time he was in contact with the Shaw interests whom he knew were interested in purchasing United.*

Defendant Massey informed Mrs. Schwartz of an offer in April of 1952 to purchase United. He failed to reveal the Taper offer, the Metz negotiations, or the Landes offer which was made in May of 1953. *The appellant knew of at least two offers (Ahmanson and Metz). He also knew of defendant Massey's continual search for a purchaser for United.*

Defendant Massey disclosed the dividends paid in the past since 1948 and indicated that until such time as certain litigation was settled and the reserves firmly established the dividend would remain at 10 per cent per year on the basis of $100 par, but he failed to disclose that business was actually so prosperous that in the "forseeable future" the association would be able to increase the dividends to 40 per cent.

As a further inducement for the sale of the estate stock, appellant, at the meeting, pointed out to the administratrix that the estate would receive only $1,100 a year in dividends

on this stock, whereas, if the money received from the sale of this stock were just deposited in a bank the income would be greater. Appellant then analyzed the situation in light of the fact that the estate owned only a minority of the stock which, he stated, "is worth less than majority stock . . . and in the last analysis, valuation for purposes of sale has to be governed by what you can get for it, irrespective of all these figures as I see it." Appellant then pointed out that the stock could be retained, but "I don't suppose all your heirs in the Midwest would want it, would they? They would rather have the money; isn't that right?" To us there appears no reasonable doubt that appellant and defendant Massey were working in cooperation with each other. As soon as the administratrix accepted the $350 offer, appellant informed his codefendant who immediately proceeded to consummate the purchase of the estate's stock.

We also deem it noteworthy that appellant and defendant Massey agreed upon a fee of $5,000 to the former for his handling of this transaction while he was attorney for the administratrix. The trial judge was entitled to consider this fact in connection with the association of appellant and his codefendant.

When defendant Massey offered some of the recently acquired stock of United to the other directors and some question was raised as to appellant's fee, defendant Massey announced that he had been approached by a prospective purchaser of United.

Appellant's law partner was requested to inform the administratrix of the Anderson estate of the offer to purchase United, which request was transmitted to appellant, but the latter saw no reason for compliance therewith.

It is also significant that in the latter part of February, 1953, defendant Massey solicited prospective purchasers for the sale of United but such solicitations were not vigorously pursued until he had been informed on July 21st that the administratrix had agreed to the sale of the estate stock. Two days thereafter defendant Massey personally contacted Mr. Shaw with regard to the purchase of United, but purchase of the estate stock was not then complete, and on July 31st he suggested "for personal reasons," a delay of 30 days in the pending negotiations.

On August 19th the estate stock certificates were forwarded to United by appellant and defendant Massey thereupon contacted Mrs. Cook (the broker) and made an appointment for

the following day. The estate stock was transferred on August 21st and the final agreement for the sale of United to the Shaw interests was consummated some two weeks thereafter, on September 9th.

That appellant was aware of the negotiations for the purchase of a majority interest in United is indicated by his presence at the meeting on August 25th at which he acted as a scrivener and at which meeting the details of the sale were agreed upon. However, he made no inquiry as to when this sale was first contemplated—whether before or after he had advised the administratrix to accept $350 per share for the stock owned by the estate, nor did he communicate with her until the circumstances surrounding the sale were under scrutiny.

As to when appellant first learned of the negotiations to sell United to the Shaw interests, the court was entitled to consider that in December, 1953, when he was informed that the Anderson heirs contemplated legal action against him, he refused to state when he had first learned of such negotiations. In that regard, Attorney James O. Warner, who represented 60 per cent of the heirs of Charles A. Anderson, deceased, testified that on December 1st or 2d he had a conversation with appellant and others in appellant's office, wherein Mr. Warner advised appellant "at the present state of my investigation I felt I would institute an action against him and the other persons . . . I asked Mr. Reynolds (appellant) when in substance the stock had actually been delivered, and he said that it had been delivered approximately August 13, 1953. I asked him in the course of the conversation when he first learned about the negotiations that culminated in the sale of this stock, *and he did not answer that question. He stated that Mr. Massey had lied to him———.*" (Emphasis added.)

Another incriminatory aspect of appellant's conduct is his telephone call to the administratrix of the Anderson estate in December after appellant had been informed that the stock transaction in which he participated was being questioned, and in which conversation he asked for a letter in which the administratrix would say that she knew of the proposed sale of United.

With reference to the compromise agreement hereinbefore set forth and as a result of which appellant refunded the sum of $25,000, it must be conceded as claimed by appellant, that courts favor the settlement of disputes involving

liability, nevertheless, in criminal cases we are satisfied that the facts and circumstances under which a compromise of civil liability is made may be considered by the trier of facts in connection with whether such conduct was occasioned by consciousness of guilt.

We are impressed that the evidence was amply sufficient to show that appellant and his codefendant associated themselves together to accomplish by concerted action the sale of the estate stock in order that defendant Massey and the other directors of United might obtain control of the majority of the stock in said corporation with a view to disposing of such controlling interest at a price far in excess of the price paid for the estate stock. True, there was evidence in conflict with the foregoing—evidence, which if believed by the trial judge would have sustained inferences contrary to those drawn by him, but, on an appeal from a judgment of conviction in a criminal case we are required to view the evidence in a light most favorable to the prosecution (*People* v. *Newland, supra*; *People* v. *Kristy*, 111 Cal.App.2d 695, 698 [245 P.2d 547]), and on appeal, in the case of conflicts in the evidence, our function is limited to a determination of whether there is substantial evidence, contradicted or uncontradicted, to sustain the conclusion reached by the duly authorized arbiter of the facts.

We come now to a consideration of the question of whether the evidence was sufficient to establish that the foregoing acts and conduct of appellant and his codefendant Massey were in furtherance of a common desire to accomplish an *unlawful* object. ▆▆ It is now well established that the offense of grand theft as defined in section 484 of the Penal Code includes the crimes of larceny, embezzlement, and obtaining money by false pretenses, and a judgment of conviction of grand theft, based on a general verdict of guilty can be sustained only if the evidence discloses the elements of one of the consolidated offenses (*People* v. *Ashley*, 42 Cal.2d 246, 258 [267 P.2d 271] ; *People* v. *Jones*, 36 Cal.2d 373, 376 [224 P.2d 353]). ▆▆ We are satisfied that the evidence offered in the instant case in proof of appellant's commission of the crime of grand theft must be considered on the theory of fraud committed by false pretenses. ▆▆ The elements of the crime of grand theft on this theory of obtaining money or property by false pretenses are: (1) an *intent to defraud*; (2) an actual fraud committed; (3) the use of false pretenses to perpetrate the

fraud; and (4) reliance upon the fraudulent representations in parting with the money or other property. (*People* v. *Jones, supra*, p. 377; *People* v. *Baird,* 135 Cal.App.2d 109, 114 [286 P.2d 832].)

It would unduly prolong this already lengthy opinion to here restate the evidentiary features of this case. ▉ What constitutes fraud and false pretense may not be the subject of a definite or invariable rule, but we feel that it may justly be said that included therein are the elements of trick, cunning, dissembling and unfair ways by which another is deceived. Deception deliberately practiced for the purpose of gaining an unfair advantage of another is fraud.

▉ Appellant herein was an attorney at law. He was counsel for the administratrix of the estate of Anderson and as such it was his duty, by reason of the confidence reposed in him by such administratrix, to make full disclosure of all material facts within his knowledge relating to the transactions here in question. Appellant was also counsel for United, as well as for his codefendant Massey personally, and was well informed as to the affairs of United. Appellant also accepted a fee of $5,000 from his codefendant and the other directors for his services in securing for them at $350 per share the stock owned by the estate for which he was legal counsel, and which, within some two weeks after transfer of said stock, was sold for $2,800 per share. To us, the foregoing narrative of testimony received at the trial depicting a course of conduct in which appellant knowingly participated, teeming with fraud and replete with intrigue, deception and duplicity, warranted the trial judge in finding appellant guilty of grand theft involving an intent to defraud the estate of Anderson by the use of false pretenses to perpetrate the fraud and accompanied by a reliance upon the fraudulent representations by appellant's client, the administratrix of the estate of Anderson in parting with the 110 shares of stock in United.

We have painstakingly read the voluminous reporter's transcript containing as it does more than 3,000 pages; we have carefully read appellant's briefs in connection therewith consisting of 302 pages—from all of which we conclude that appellant had a fair and impartial trial. In fact, the learned trial judge displayed to defense counsel unusual consideration and patience. His decision, in our opinion, was based on clear and convincing proof.

For the foregoing reasons, the judgment and the order deny-

ing defendant's motion for a new trial are, and each is affirmed.

Doran, J., and Fourt, J., concurred.

A petition for a rehearing was denied July 10, 1957, and appellant's petition for a hearing by the Supreme Court was denied August 8, 1957, with Dooling, J. pro tem.,* participating therein in place of McComb, J. Carter, J., and Schauer, J., were of the opinion that the petition should be granted.

*Assigned by Chairman of Judicial Council.