[Crim. No. 3728. Second Dist., Div. One. Oct. 5, 1943.]

THE PEOPLE, Respondent, v. PHILLIP J. MURPHY et al.,
Appellants.

Samuel A. Rosenthal and Paul Angelillo for Appellants.

Robert W. Kenny, Attorney General, and Gilbert F. Nelson, Deputy Attorney General, for Respondent.

WHITE, J.—In an information filed by the District Attorney of Los Angeles County, defendants were jointly charged in two counts with the crime of abortion. Subsequent to the entry of not guilty pleas, count I of the information was dismissed and count II was amended to show the crime charged as a violation of section 274 of the Penal Code. The charging part of the information as amended alleged that the defendants did "willfully, unlawfully and feloniously provide, supply, use and employ an instrument upon the person of one . . . , a woman, with the willful, unlawful and felonious intent then and there and thereby to procure the miscarriage of the said . . . ," and that the use and employment of said instrument to procure said miscarriage was not then and

there necessary in order to preserve the life of the woman named in the pleading.

Trial by jury resulted in the conviction of both defendants of the crime charged in the amended information. They moved for a new trial which was denied. No judgment was pronounced against either defendant but the proceedings were ordered suspended and they were placed on probation conditioned upon defendant Murphy serving a term of two years, and defendant Jones serving a term of one year, in the county jail. The defendants filed notice of appeal from "the court's order denying each defendant's motion for a new trial and from the judgment and sentence of the court."

■ When, as in the instant case, no judgment was pronounced; proceedings were suspended and the defendants placed on probation, they are without a right of appeal except from the order denying their motion for a new trial. (*People v. DeVoe*, 123 Cal.App. 233 [11 P.2d 26]; *People v. Johnson*, 14 Cal.App.2d 373, 375 [58 P.2d 211]; *People v. Dawes*, 37 Cal.App.2d 44, 46 [98 P.2d 787]). The attempted appeal from the "judgment and sentence" must therefore be dismissed and consideration given only to the claimed error on the part of the trial court in denying the motions for a new trial.

The factual background surrounding this prosecution may be thus epitomized: Defendant Murphy is a physician and surgeon, licensed to practice his profession in the State of California, and specializing in gynecology, described by him as "the art and science of women's diseases." Defendant Jones was employed by her co-defendant as an office receptionist and operative assistant, who, in the instant case, "prepared the instruments and the table and the anaesthetic, washed the external parts (of the patient) with lysol and placed (the patient) in position" for the surgical operation. After the rendition of these services, according to Dr. Murphy, his co-defendant, Miss Jones, left the room, was not present and did not assist in the actual operation.

The prosecutrix in this case was married in August of 1941. On March 3, 1942, she gave birth to a baby boy. She menstruated once in May, after the birth of the baby, but missed her menstrual period in June, and considered herself pregnant. Because of this belief, she went to a Dr. Obando, who examined her on the occasion of her first visit and again some two weeks thereafter. Dr. Obando made another manual examination of her pelvic region. Following these two ex-

aminations, the prosecutrix went to the office of defendant Dr. Murphy, where, on the occasion of her first visit, she was met by the defendant Miss Jones. She informed Miss Jones that she had been referred to Dr. Murphy by Dr. Obando; that she asked Miss Jones "What was the price to have something done to me?" to which, according to the testimony of the prosecutrix, defendant Miss Jones asked her "How long are you—how long was I pregnant, and I told her the date." Defendant Miss Jones then inquired of the prosecutrix as to how long the latter had gone without menstruation, after which defendant Miss Jones said "We don't do anything to anybody after they are seven weeks." After being informed that "The price is $75.00," the prosecutrix stated she did not have that much money with her and made an appointment to return with the money on July 21st. On the last named date, the prosecutrix returned to the doctor's office in company with a friend. Defendant Jones then called her into a room, asked for the $75, which she paid but no receipt was given therefor. At the request of Miss Jones, the prosecutrix then signed a card consenting to an operation, and returned to the reception room to advise her friend, as suggested by defendant Miss Jones, to return at 2:30 o'clock. The prosecutrix was then returned to another room by defendant Miss Jones who placed her on a table and who, after the prosecutrix had disrobed and put on "a sort of a smock," administered the anaesthetic. At the time the anaesthetic was administered, defendant Dr. Murphy was present in the room, standing on the other side of the table. While engaged in a conversation with Dr. Murphy during the administration of the anaesthetic, the prosecutrix "went to sleep" and remembers nothing thereafter until after the operation when she revived, and after waiting about half an hour, her friend came and the prosecutrix was taken home. After the operation on July 21st, the prosecutrix again visited Dr. Obando. The latter made an examination of her, after which she again returned to appellant Murphy's office where she was examined by him. At that time Dr. Murphy gave her a prescription. A few days later she again visited Dr. Murphy's office where her temperature was taken by defendant Miss Jones who gave her a yellow box containing large pills.

The prosecutrix testified that when she went to Dr. Murphy's office for the operation she was in good health but following the operation did not feel very well, was nauseated and felt "as though she was still pregnant." She told both

defendants that she felt like she "was still pregnant and was suffering from nausea." Five visits to appellant's office were made by the prosecutrix and on the occasion of the last one she had commenced to flow heavily. On this last visit she was put on the table and defendant Dr. Murphy inserted a tube of jelly into the prosecutrix's vagina, informing her that this would give her pain, and she testified she had very severe pains and was very sick. Upon returning home she took to her bed. About a week and a half later defendant Dr. Murphy visited the prosecutrix at her home, inquired of her if she had discharged anything, to which she replied "nothing but blood." During the time Dr. Murphy was visiting the prosecutrix at her home, the latter's sister came in and in the presence of the prosecutrix asked Dr. Murphy what was wrong, informing him that her sister was very ill, had been flowing for ten days and was getting weaker and weaker. She asked defendant Dr. Murphy to send the prosecutrix to a hospital or to refund half the money paid him so that arrangements could be made for her hospitalization. Defendant Dr. Murphy refused to do either and insisted that the prosecutrix would be all right. This was the last time the prosecutrix saw either defendant.

According to the testimony, the prosecutrix continued to flow and to discharge large clots and on one occasion discharged three large pieces. She then went to a hospital where she remained almost a month under treatment of Dr. N. A. Davis. The sister of the prosecutrix testified that defendant Dr. Murphy told her that her sister's womb was dilated but that she would be all right and advised against hospitalization.

Dr. Davis testified that he was a graduate of a recognized school of medicine in the year 1933; that he made an external examination of the prosecutrix at the hospital and found evidence of pelvic inflammation which appeared to be an active infection existing over some period of time. He found the prosecutrix rigid about the pelvic region, with an elevated pulse, temperature, and a fast heart. His examination disclosed evidence of secondary anemia, a loss of blood in excess over normal with a marked shortage of red blood cells. He described the flow of blood as not having the appearance of a normal menstrual flow. In describing his diagnosis, Dr. Davis testified "My diagnosis and my examination three weeks after the first time that I had examined Mrs. . . . externally disclosed a uterus somewhat boggy, not over-enlarged; apparently showing that there had been a recent congestion

of the uterus. Now, that congestion of the uterus, from her infected condition, would indicate that she had had some infection, *but whether it was from instrumentation or from any irritation from any other source or from any infection,* from a gonorrhoeal infection or anything typical, *it may be any number of causes.*" (Emphasis added.) The doctor further testified that he took a smear for gonorrhoea and found it negative. In describing the treatment administered by him, Dr. Davis testified "The treatment of these types of conditions are subject to so much controversy, but as a general rule is more of the basic type of treatment; that might be a conservative type of treatment. When they are running an infection and running a fever, and there is evidence of anything of an undisclosed cause we usually treat those conditions as if they were a septic problem; that is, an infected problem and rather give them conservative medical treatment, rest, sedatives, food, transfusions, and things of that sort. Now, that is the type of treatment Mrs. . . . has had." The same doctor further testified that in his opinion the anemic condition from which the prosecutrix suffered was "the result of some active congestion of that uterus or else some possibility of irritation from either instrumentation or pregnancy or a tubal pregnancy that had ruptured in the uterus spontaneously, possibly sex irritation, stimulation of the uterus from any number of causes that would bring on active congestion of the uterus."

The circumstances surrounding the arrest of the defendants was testified to by Officer Fremont during which testimony there were introduced into evidence certain surgical instruments found in Dr. Murphy's office together with record cards of his cases, including the case of the prosecutrix. These case records were found in a dentist's office in a separate suite in the same building and were not discovered until the day following the arrest of the defendants when the defendant Miss Jones directed the officers to where they could be found.

S. W. Brooks, special agent for the State Board of Medical Examiners, testified he was present at the time the defendants were arrested. In relating some of his conversations with the defendants, this witness testified "I said to Dr. Murphy, 'Dr. Murphy, you understand we are here making an investigation of various reports that you have been doing abortion,' and Dr. Murphy replied, 'Yes.' 'Now,' I said,

'Doctor, in order to save time for all of us, I know that you are a busy man, will you just show us or get for us the various instruments and medicines that you use in performing these abortions,' and he said, 'Yes, I will.' " In another portion of his conversation with defendant Murphy, this witness testified "I said, 'Doctor, I understand that you also use a paste, and that you inject this paste into the uterus.' He said, 'Yes.' I said, 'Doctor, will you get this syringe that you use for the purpose of injecting this paste into the uterus?' He said, 'Yes, I will get it for you.' And he went to a cabinet nearby and pulled a syringe from this cabinet and gave it to me."

Defendant Dr. Murphy, testifying in his own behalf, stated that the prosecutrix came to him on recommendation of Dr. Obando with the thought in her mind that she was pregnant. That upon her first visit he examined her and found a polyp protruding through the surface of the uterus. That he told the prosecutrix that such type of polyp often led to an infection which might produce a peritonitis condition and that he made arrangements to operate upon the prosecutrix for the sum of $75. It might here be noted that throughout his testimony defendant Dr. Murphy contended that the prosecutrix was not pregnant and that he did not treat her for any such condition but for the polyp condition, which he testified often ensues after the delivery of a child. He testified that he found the womb dilated; that he gradually opened up the neck of the womb and with a small curette, curetted it thoroughly. The witness then testified to the post-operative directions he gave to the prosecutrix and described the medicines which he directed her to take. He admitted the conversations with the police officer and the Medical Board inspector concerning the instruments in his office which he contended are found in the office of any physician specializing in that branch of medicine to which he devoted his efforts. Defendant Dr. Murphy admitted that the prosecutrix told him that Dr. Obando had advised her she was pregnant but denied that any mention was ever made concerning an abortion and vigorously contended that no condition of pregnancy existed in the prosecutrix, and that he did not treat her for any such condition.

The defendant Kathleen Jones did not testify at the trial. We shall first give consideration to the claims advanced by defendant Dr. Murphy in support of his conten-

tion that the order denying him a new trial should be reversed. He urges that the evidence is insufficient to sustain his conviction because as a matter of law it is lacking in the required statutory corroboration. In that connection he asserts that, aside from the testimony of the prosecutrix and the extrajudicial statements of his co-defendant Kathleen Jones, there was no evidence connecting him with the commission of the offense charged against him. With commendable fairness the attorney general concedes that the admissions and confession made by the defendant Miss Jones after the arrest of both defendants cannot be considered as evidence against Dr. Murphy, and as the attorney general points out, such confession was admitted at the trial only as against the defendant who made it. Section 1108 of the Penal Code provides that upon a trial for violation of section 274 of the same code, the defendant cannot be convicted upon the testimony of the woman upon whom the offense was committed unless she is corroborated by other evidence. ■ The very gist of the offense charged against these defendants is that they used an instrument with intent thereby to procure the miscarriage of the woman named in the information. Therefore, unless there was actual knowledge on the part of defendant Murphy of the pregnancy of the woman, or a belief upon his part that the woman was pregnant, there could not exist the required and necessary intent upon his part to procure the miscarriage of such woman. The question therefore arises as to whether there was present in this case evidence, other than the testimony of the prosecutrix, of sufficient substantiality to warrant a conclusion by the jury of the requisite guilty intent upon the part of defendant Dr. Murphy (*People* v. *Richardson*, 161 Cal. 552, 564 [120 P. 20] ; *People* v. *Wilson*, 54 Cal.App.2d 434, 448 [129 P.2d 149]). In the legitimate exercise of his profession the defendant doctor was entitled to examine the prosecutrix to ascertain if she was pregnant, and if such examination established the existence of such a condition or gave rise to a belief upon the part of the doctor that she was pregnant; and he proceeded with the use of an instrument to produce or attempt to produce a miscarriage, then he was guilty of the offense charged against him.

■ While the defendant doctor at all times denied the charge against him, criminal intent can rarely, if ever, be shown by statements or testimony of a defendant. We, therefore, have in this state a very common sense rule announced in section 21 of our Penal Code that ''The intent or inten-

tion is manifested by the circumstances connected with the offense. . . ." We must, therefore, examine the circumstances connected with the offense charged to determine whether they are of such a nature as to disclose the requisite criminal intent. In addition to the testimony of the prosecutrix, we have in this case certain instruments found in the doctor's office at the time of his arrest and which were capable of being used to bring about an abortion. ■ In view of the fact that the procurement of a miscarriage is permissible under certain conditions (sec. 274, Pen. Code), the court properly instructed the jury that the defendant doctor was lawfully entitled to have such instruments in his possession. Certain case history card records belonging to Dr. Murphy which were found in the office of a dentist in the same building in which defendant Murphy's office was located were introduced in evidence. The claimed concealment of these cards, it is urged by respondent, is a circumstance inconsistent with the theory of innocence. There is also present the further fact that Dr. Murphy admittedly had a conversation with the sister of the prosecutrix wherein the doctor refused to send his patient to a hospital or to refund any of the money received by him as payment for his professional services. However, nowhere in this conversation was anything said about an abortion or an attempted one. Then there is the testimony that when defendant doctor visited the prosecutrix at her home he used utragel, which he admitted was also used to induce hemorrhage and as an abortifacient.

It is significant in this case that Dr. Obando, whom the prosecutrix testified advised her she was pregnant, was not called as a witness to corroborate her in that regard. The attorney general also relies upon the testimony of Dr. N. A. Davis, who treated the prosecutrix after she was hospitalized following her treatment by defendant Dr. Murphy. This testimony it is claimed, furnishes grounds upon which the jury might predicate an inference of defendant Murphy's guilt. However, recourse to the reporter's transcript shows that Dr. Davis testified that he examined the prosecutrix externally only, as to objective symptoms and found pelvic inflammation appearing to be an active infection for some period of time. With reference to the flow of the prosecutrix being of a darkish and bloody color, Dr. Davis testified "which could have been an excessive flow from many causes." The same witness testified, in epitomizing his diagnosis "Yes, I stated in my diagnosis that her anemic condition probably

was the result of some active congestion of that uterus or else some possibility of irritation from either instrumentation or pregnancy or a tubal pregnancy that had ruptured in the uterus spontaneously, possibly sex irritation, stimulation of the uterus from any number of causes that would bring on active congestion of the uterus.'' ▮ As we view the testimony in this case, exclusive of that given by the prosecutrix, it is insufficient, as a matter of law, to establish the pregnancy of the prosecutrix or the fact that there existed in the mind of defendant Dr. Murphy a fully formed belief that pregnancy existed. The evidence being insufficient, as a matter of law, to establish an intent upon the doctor's part to cause a miscarriage, which is the gist of the offense, his conviction cannot be sustained (*People* v. *Richardson, supra*). ▮ It must be remembered that the corroborative evidence, although not required to extend to every material fact, must nevertheless have relation to some portion of the testimony which is material to the issue (1 C.J. 332, sec. 112). ▮ In whatever light the corroborative evidence in this case is viewed, nevertheless, in order to give it effect, even as tending in that direction, it is necessary at every point to interpret and explain the ''corroborative circumstances'' in the light of the testimony of the prosecutrix. Before it can be said to connect the defendant Murphy with the commission of the crime charged against him, recourse must be had to the testimony of the prosecutrix. And, though we may concede that such corroborative evidence arouses a suspicion, even a grave suspicion, nevertheless it is not sufficient to establish the corroboration required by law. Furthermore, when viewed without recourse to the testimony of the prosecutrix, the ''corroborative circumstances'' standing alone, while they may be said to generate a suspicion of guilt, are as compatible with innocence as they are with guilt of the crime denounced by section 274 of the Penal Code. Hence, the corpus delicti of the crime charged herein was not proven (*People* v. *Gilbert*, 30 Cal.App.2d 321, 323 [86 P.2d 135]; *People* v. *Braun*, 31 Cal.App.2d 593, 602 [88 P.2d 728]; *People* v. *Davis*, 210 Cal. 540, 555 [293 P. 32]). ▮ Unless the ''corroboration'' furnishes inculpatory evidence—that is, evidence tending to connect the defendant with the offense, then there is no legal and sufficient corroboration (*People* v. *Morton*, 139 Cal. 719, 724 [73 P. 609]). ▮ Appellant Dr. Murphy next finds fault with the

action of the court in giving certain instructions upon the law of conspiracy. In this regard, for instance, the jury was instructed that "In this connection, you are instructed that where a criminal conspiracy has been formed, each of the persons forming the same is liable for each and all the acts and bound by the declarations, of each and all of the conspirators, done or made in pursuance and furtherance of the said conspiracy; while the said conspirator is a member of the said conspiracy; and every person who enters into and becomes a party to the said conspiracy after the formation thereof, and adopts the said conspiracy and its purposes and objects, becomes liable for each and all of the acts, and is bound by each and all of the declarations, of each and all of the other conspirators, done or made from the time of the formation of such conspiracy, in pursuance and furtherance of the said conspiracy, as long as he is a member thereof." Other similar instructions were given. While the foregoing is a correct abstract statement of the law, nevertheless that legal principle presupposes that before the acts or declarations of one or more of the conspirators, done or made at a time prior to the entering into the conspiracy by the particular person charged, can be used in evidence against him, the fact of the existence of the conspiracy at the time such acts were done or declarations made must have been shown by some degree of proof sufficient to justify the court in admitting the evidence of such prior acts or declarations. ▮ It is further the law that such proof cannot consist merely in the acts and declarations of the alleged co-conspirators, but must partake of the nature of an independent showing as to the existence of the conspiracy at the very time when the acts were done or declarations made by which the persons alleged to have subsequently joined the conspiracy are sought to be bound. ▮ Needless to say, in the case at bar, there is no evidence as to the existence of a conspiracy except the uncorroborated testimony of the prosecutrix and the extra-judicial statements of defendant Kathleen Jones, the latter of whom was a co-conspirator. No admissions made or testimony given by defendant Dr. Murphy tend even in the slightest degree to establish the existence of a criminal conspiracy. It was, therefore, error for the court to give the foregoing and kindred instructions on the principle of conspiracy. That such instructions, under the circumstances here existent, were prejudicial is at once evident. ▮ Finally appellant Dr. Murphy asserts that the deputy district attorney in charge of

the case for the prosecution was guilty of prejudicial misconduct during the progress of the trial. In this regard the record discloses that during the cross-examination of defendant Dr. Murphy, the following occurred: "Q. (by deputy district attorney) Do you recall being before the State Board of Medical Examiners on October 22, 1942? A. No, sir." Following timely objection and assignment of the asking of this question as prejudicial misconduct, the matter was presented to the court outside the presence of the jury, during which discussion the court inquired of the deputy district attorney "Is your offer of proof that he has been found guilty before the Board of Medical Examiners?" to which the prosecutor replied "Yes, your Honor"; whereupon the court stated "Then the objection will be overruled." Thereupon with the jury present, the following transpired: "Q. (by the deputy district attorney) Doctor, do you recall being before the California State Board of Medical Examiners in Sacramento on October 22, 1942? A. Yes, sir. Mr. Rosenthal: Subject to all the objections heretofore made. The Court: The objection will be overruled. The answer he has given is 'yes.' Q. (by the deputy district attorney) Weren't you at that time found guilty by the California State Board of Medical Examiners of committing an illegal abortion on Geneva N. Ballard and Edith M. Palmer? Mr. Rosenthal: To which we object on the ground that the decision of that body, if any were made, is the best evidence. The Court: The objection will be overruled. Mr. Rosenthal: I object to that question on the ground it is calling for the conclusion of this witness, that if there was any decision made and a finding made, or any decision reached by that board it is a matter of public record, and the record itself is the best evidence. The Court: The objection overruled. You may answer the question. A. Yes, sir." When appellant Murphy's counsel on redirect examination attempted to elicit from the witness the fact that the proceedings before the State Board of Medical Examiners, about which the witness had been interrogated on cross-examination, were not completed and that a further hearing was scheduled for May 8, 1943, objections thereto by the prosecutor were sustained by the court.

At the trial the deputy district attorney sought, as does the attorney general upon appeal, to justify the asking of the aforesaid questions upon the authority of *People* v. *Page,* 28 Cal.App.2d 642 [83 P.2d 77]. In the cited case the de-

fendant was charged with the crime of murder, and it was contended upon appeal that the district attorney was guilty of misconduct when on cross-examination he interrogated the defendant regarding the latter's army record. In deciding this contention against the defendant in that case, it was said by the court, at page 649, "The defendant had testified at length as to his military service and had taken pains to build up an enviable reputation as an army officer. He had also testified that he was still a captain of the reserve corps. The cross-examination objected to related to proceedings before an army board and his discharge for misconduct. The whole subject-matter was opened by the defendant in his direct examination, and there was neither misconduct nor error in the cross-examination which was designed to impeach that testimony." In the case at bar no such situation is present. On his direct examination defendant Dr. Murphy testified to the fact that he was a graduate of a recognized school of medicine; that he was formerly a surgeon in the United States Navy Medical Corps; that after leaving the naval service in 1923, he practiced his profession in the city of Chicago until 1925 when he migrated to California where he has been practicing continuously since. When defendant Dr. Murphy had completed his direct testimony, counsel for his co-defendant Kathleen Jones stated that he adopted for and on behalf of defendant Miss Jones, the testimony given by Dr. Murphy, and stated "In addition to that I would like to ask him one or two questions." Thereupon counsel for defendant Kathleen Jones propounded the following interrogatories to appellant Dr. Murphy: "Q. Doctor, in addition to the professional entitlements which you have related, are there any others? May I put my question this way? What does F.A.C.S. mean to a doctor? A. I am a Fellow of the American College of Surgeons. Q. Do you cherish that degree? A. You bet I do. Q. And do you have one? A. I have. Q. And how did you become a member of a Fellow of the American College of Surgeons? A. It is highly selective. Q. What must one do in order to attain that entitlement? A. You must have had at least 300 operations within the preceding two years, 100 of which must be written up in detail and 200 in summary form."

In the case of *People* v. *Page, supra,* the testimony given by the defendant and by means of which, as the court said, he "had taken pains to build up an enviable reputation as an army officer," and that he was at the time he testified a

captain in the reserve corps, had no relevancy to or connection with the crime of murder with which he was charged, while in the instant case the very nature of the offense charged and the circumstances under which Dr. Murphy, as a physician, treated the prosecutrix required him to establish his qualifications to give his expert opinion as to whether or not she was pregnant, and why he arrived at the conclusion she was not, and also why he treated her as he did if no condition of pregnancy existed. The testimony here given could in no sense be said to have been offered, as in the Page case, for the purpose of establishing good character or a good reputation for truth and veracity. Under the limitations of the rule applicable to the cross-examination of a defendant in criminal cases (*People* v. *Gilliland*, 39 Cal.App.2d 250 [103 P.2d 179]) it was error to permit the challenged interrogatories to be propounded to defendant Dr. Murphy on cross-examination, concerning matters pending before the State Board of Medical Examiners and the determination thereof by that board. A mere reading of the questions at once suggests the damaging effect thereof upon defendant Dr. Murphy. To conclude otherwise would be to ignore human experience. The prejudicial effect of the testimony cannot be exaggerated when we consider that the defendant doctor was charged with the crime of abortion, and by such testimony the prosecutor sought to impress upon the jury that the witness had theretofore been found guilty by an administrative board of committing two other such offenses. Appellant Dr. Murphy was entitled to have his case fairly tried according to established rules of law whether he was innocent or guilty. A contrary holding would but serve to provide ways and means for the conviction of the innocent. Due process of law requires that everyone accused of crime shall have that fair and impartial trial guaranteed by law (*People* v. *Braun, supra,* at page 602; *People* v. *Lynch,* 60 Cal.App.2d 133 [140 P.2d 418]). From what we have herein stated, it follows that the order denying defendant Dr. Murphy's motion for a new trial must be reversed.

 We come now to a consideration of the appeal taken by defendant Kathleen Jones from the order denying her motion for a new trial. At the trial there was introduced in evidence, solely as against her, a confession made by her to certain police officers and an inspector for the State Board of Medical Examiners. However, as we have heretofore pointed out, the corpus delicti of the offense herein charged was not

established by legal, competent or sufficient evidence. Therefore, the incriminatory extra-judicial statements made by defendant Kathleen Jones were not admissible in evidence against her. Except for the uncorroborated testimony of the prosecutrix and the statements of defendant Miss Jones herself, there was no evidence of sufficient substantiality to establish the fact that the crime denounced by section 274 of the Penal Code, with which the defendants were jointly charged, was committed. Therefore, under familiar and well established rules of law, the extra-judicial statements of defendant Kathleen Jones, made after her arrest, were not admissible as evidence against her. The order denying her motion for a new trial cannot, therefore, be sustained.

The attempted appeals from "the judgment and sentence" are dismissed. The order denying the defendants' motion for a new trial is reversed as to each of them, and the cause remanded for a new trial.

York, P. J., and Doran, J., concurred.