[Crim. No. 8242. Second Dist., Div. Four. May 10, 1963.]

THE PEOPLE, Plaintiff and Respondent, v. BRUCE ALEX-ANDER MacEWING et al., Defendants and Appellants.

Nathan Harris Snyder, Abraham Gorenfeld, Jack Corinblit and Kenny, Morris & Ibanez for Defendants and Appellants.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Jack K. Weber, Deputy Attorney General, for Plaintiff and Respondent.

JEFFERSON, J.—By information (SC 245144), the defendants and Virginia Aguilar were charged in Count I with conspiracy to commit abortions in violation of section 274 of the Penal Code and in Count II with attempted abortion in violation of section 664 of the Penal Code. Several overt acts were alleged in the conspiracy count. The information charged defendant MacEwing with a prior conviction of conspiracy and abortion.

In a separate information (SC 245639), defendant MacEwing was charged in three counts with a violation of section 11162 of the Health and Safety Code for writing narcotics prescriptions which did not conform to the provisions of the Health and Safety Code. Defendant MacEwing's prior conviction was also alleged in this information. Defendants entered pleas of not guilty and defendant MacEwing denied the prior conviction. A motion by the People to consolidate the two informations was granted. Trial was by jury, and before the taking of testimony defendant MacEwing admitted the prior conviction out of the presence of the jury. Defendants were found guilty as charged. Motions for new trial and probation were denied, and defendants were sentenced to state prison for the terms prescribed by law, sentences to run concurrently as to each count. Defendants appeal from the judgments and from the orders denying motions for new trial.

The subject of the alleged abortion attempt, Carol, testified she missed her regular menstrual period due May 4, 1961, and visited Dr. Owen Felt, a neighborhood doctor. The date of this visit was approximately the second week in May. Dr. Felt made an incomplete pelvic examination and took a blood test to determine pregnancy. When Carol's mother asked him what could be done if the test came back positive he replied that he could take care of it as he had connections.

The next morning Dr. Felt called Carol and informed her she was pregnant. In response to the request that he do something he said he would make a few phone calls.

A few days later he gave Carol's mother an address—1487 Atlantic—and said Carol should be driven there by one of her parents between 9:30 and 10 o'clock and the problem would be taken care of. He said his name should not be mentioned; he had called and made arrangements and Carol was expected but there was a possibility they would turn her down, as they turn people down every day, but that she would come highly recommended and there was no reason to turn her down.

On Friday, June 2, Carol's father drove her to 1487 Atlantic. Shortly after they entered a reception room, Virginia Aguilar came into the room and inquired if she could help them. Carol said a friend had made an appointment for her the day before. Aguilar asked "Did Dr. Felt send you?" Carol gave no response to this question. When Aguilar informed them the doctor who would examine her was not there, an appointment was made for 2 p.m. the same day. When they returned Aguilar asked Carol to fill out a form. In addition to the information required, Carol wrote on the form she was referred by Owen Felt. Aguilar scratched this out; had her partially disrobe and handed her a sheet.

Defendant Reed came in after a few minutes and said, "You are a young one, aren't you?" Carol answered she didn't think she was so young. Defendant proceeded to give her a pelvic examination. No conversation took place during this examination which lasted for a minute or a minute and a half.

Afterwards, a $6.00 fee was paid by Carol's father. Aguilar then told Carol and her father the cost of the operation would be $500. She explained that the operation would take place Monday or Tuesday; the doctor who would perform the operation was out of town but she expected a call from him that evening; she would call Carol that night to let her know which day; that when she called she would say it was Virginia and would ask Carol to lunch on the appropriate day. Carol was told to take a douche, shave and take an enema the night before and not to take any aspirin or drugs. Aguilar explained that she would be put completely out with sodium pentothal, everything would be fine and a licensed anesthetist and a doctor would care for her. She said Carol would not be able to drive herself home, that her father should not come near the office but should pick her up at 5:15 on the corner of 14th and Atlantic. She was told to come at noon and to wear loose-fitting clothes.

Carol's father testified Aguilar informed him Carol would feel no ill effects and would come out of it a much better girl. He was told to be prepared to pay $500 in small bills.

Carol testified that at about 10 o'clock that evening Aguilar called and said, "Carol, this is Virginia. Could you have lunch with me on Monday?" Carol said, "Yes, that will be fine." Sunday evening Carol made the necessary preparations. Her father gave her $500 in ten and twenty-

dollar bills. On Monday he drove her as instructed to 14th and Atlantic.

She entered the clinic at 12:02 and was told by Aguilar it would be a few minutes before the doctor could be with her. There were others in the waiting room. After a short time she was taken to a small room and instructed to disrobe and to put on a hospital gown. Aguilar made up a hospital bed for her and gave her a shot which she said would relax her. Aguilar then asked for the $500, and when Carol gave it to her she counted it and put it in her pocket.

Carol asked if Aguilar would mind calling her mother after the operation to tell her that the dinner party had been a success. This statement had been prearranged with Carol's mother to indicate all was well. Aguilar agreed to make the call and asked Carol for the phone number. When Carol said she had given it to her before with the other information, Aguilar replied, ''We don't keep any records. Will you give it to me again?'' Carol complied. Inspector Hermanson of the Long Beach Police Department then entered the room.

Carol testified she was still pregnant at the time of the trial, that interruption of her pregnancy was not necessary to save her life.

Police Officer Raymond Henry testified that, on June 5, the police department had the premises of 1487 Atlantic under surveillance. He stated he arrived at 11 a.m. and stationed himself outside. A note was printed on the front of the building which stated that it was the Parkview Medical Center. Office hours were given together with the statement that in an emergency Ralph R. Reed, M.D., should be called. An address and phone number followed. The officer saw Carol get out of a car half a block south of 1487 and walk there. At about 1 p.m. the police decided to enter the building.

Officer Henry testified he saw defendant MacEwing entering an examining room. He also observed Carol in a rear portion of the building. On a desk in the office area the officer noticed a sum of money partially hidden by a desk blotter. Upon closer examination he discovered the amount to be $200. In the center drawer of the same desk, which was partially open, he found another $200. MacEwing admitted he was sitting at the desk but denied any knowledge of the money. He said he was there looking for papers which related to the estate of a Mrs. Walling. When officer Henry asked where the other $100 was located Aguilar handed him a small package of money rolled up in a pre-

scription blank printed under the name of defendant Reed. There were a capital "O" and a capital "F" marked on the package with a date of 6-5-61. The package contained $100. All the money found was in denominations of 10 and 20 dollars. He asked Aguilar if the "O.F." stood for Owen Felt and if this was the money he was to realize for referring the girl for the abortion. She replied that it merely indicated office funds. A check with MacEwing's name on it was found tacked to a wall.

In a back room Officer Henry found a tray of surgical instruments and an ampule of sodium pentothal on top of a table. A sheet covering the instrument tray was yellowed, a common result of having been sterilized.

The officer further testified defendant Reed entered the building approximately 20 minutes after the officers. He asked Reed if he knew what this was all about and Reed said, "I think I have an idea, but I haven't done anything," or words to that effect. Reed had no surgical instruments with him. The officers could not locate a file on Carol although Aguilar had said she made a record of every patient. She failed to answer when asked if she had a file on Carol.

Statements of Aguilar and defendants taken after their arrest were read into evidence. Aguilar stated she was not a registered nurse. She described herself as a bookkeeper and receptionist. She stated defendant Reed was the only doctor who used the clinic and that he came in four days a week. Defendant MacEwing was seldom there. He came in only to take care of the estate of Mrs. Walling, of which he was executor. Aguilar admitted receiving $500 from Carol but stated she did not know that Carol was there for an abortion. She stated she ran the office and paid rent out of office funds.

In response to interrogation by the police, defendant MacEwing stated he came to the office June 5 to give shots to two patients. He said he did this free of charge. He knew Dr. Felt but had never referred a patient to him. He also knew defendant Reed but had not seen him often enough to classify him as a friend. He denied having knowledge of any abortion.

Defendant Reed admitted he came to the clinic four days a week to see patients. He stated he was the only doctor there except for a Dr. Walker who did not actually practice because of his advanced age. He stated he knew both Dr. Felt and defendant MacEwing; he was paid by Aguilar for

his services at the clinic. He admitted making a pelvic examination of Carol but stated he was given to understand its purpose was for a pessary fitting.

Dr. Felt's testimony was read into the record without objection, it appearing that he was in Hawaii at the time of the trial. He had given Carol an incomplete pelvic examination and had a blood test made. The results indicated the possibility that she was pregnant. In response to the request by Carol's parents that he do something he told them of a place on Atlantic Boulevard where they could go. He didn't know whether the job would be done but he did know there was a contact there. He gave Carol's parents the address on May 27. He had called and made an appointment. The person who answered the phone sounded like Aguilar. He did not discuss abortion during this call but simply said he believed the girl was pregnant and stated he was going to send her down for further investigation and to refer her for the pregnancy "to be interrupted" if she was pregnant. Aguilar said she could give Carol an appointment.

Dr. Felt stated he had sometime in the past referred a case to the clinic at 1487 Atlantic. Mrs. Walling, a person financially interested in the clinic, had come to his office after he made the referral to discuss a business matter and gave him $50 in an envelope. She did not say what it was for, and if he had thought it was for sending an abortion case to her he would not have accepted it. He stated he knew Dr. Reed, that Dr. Reed had assisted him in an operation on the morning of June 5, and that they had assisted each other at various times in the past. He did not know, however, Dr. Reed was going to 1487 Atlantic that same day.

Dr. Felt admitted he was acquainted with defendant MacEwing, having met him in 1958 when MacEwing came to his office for an insurance examination.

The prosecution introduced the tray of surgical instruments found in the back room of the clinic on June 5. At the time the testimony of Dr. Felt was taken he was shown this tray. He identified it as a D and C set (D and C meaning Dilation and Curettage). He indicated that any doctor's office would have similar instruments, that there was nothing about the equipment to indicate an abortion was performed or about to be performed. He stated that a goosebeak speculum was absent from the tray as was a dilator, which latter instrument he felt was needed to perform a D and C.

George Bryant, a medical doctor, testified that the tray of

instruments was a D and C tray, that a goosebill speculum was unnecessary for a D and C.

The prosecution introduced evidence attempting to show MacEwing's connection to the Parkview Clinic and the fact that he had illegally written prescriptions there.

Officer Henry had testified that in November or December 1960 he went to the Belmont Bowl in Belmont Shores where MacEwing was employed. In MacEwing's office he saw a magazine on which was printed defendant MacEwing's name and the address 1487 Atlantic, Long Beach. Carol had testified that while she was waiting in the clinic for the expected abortion to take place she was reading a magazine and that this magazine had defendant MacEwing's name on it together with the address 1487 Atlantic.

Ralph Powell, a real estate agent, testified he managed the property at 1487 Atlantic for an elderly lady and her son. He stated the premises were leased and that the original lease in 1956 was to defendant MacEwing and a Mrs. Walling. After MacEwing was convicted of abortion in 1958 the lease was cancelled. The following month the premises were leased to Dr. Walker and Mrs. Walling. MacEwing in April 1961 spoke to Powell about purchasing the property.

Lorrean Hubbard, an employee of the State Board of Medical Examiners, testified she went to the clinic in May 1961 feigning illness and asked Aguilar for a doctor. Aguilar said the doctor there was Dr. Reed. Defendant MacEwing then entered the room dressed in a doctor's uniform and when she inquired whether he was Dr. Reed he asked what her problem was and proceeded to take her blood pressure and to examine her, after which he gave her some pills and she paid a $10 fee and received a receipt with Dr. Reed's name on it.

Several other witnesses testified they received shots and other types of treatment from defendant MacEwing at the clinic.

The police checked 10 or 15 pharmacies in the area and removed prescriptions purportedly written by defendant Reed. All of these prescriptions were said by a handwriting expert to have been made by defendant MacEwing. Defendant MacEwing admitted his license to practice medicine had been revoked June 5, 1958, and had not been reinstated.

Defendant Reed testified in his own behalf. He stated he was a medical doctor and had been connected with the Parkview Clinic for 3 years prior to June 2, 1961. The original arrangements for his services at the clinic were made with

Mrs. Walling who operated the clinic before her death. He agreed to treat patients at the clinic 4 days a week, one hour per day, and as a fee would receive 50 per cent of the income from his work there. MacEwing, the executor of her estate, came in occasionally to check papers relating to her estate.

Defendant Reed testified he never gave anyone permission to write prescriptions for his patients. He admitted he gave Carol a pelvic examination on June 2 but asserted he assumed its purpose was for a pessary fitting. He decided she couldn't have a pessary because she might be pregnant. On June 5 he made his scheduled visit to the clinic to see his patients. He stated the instruments found at the clinic could not be used for an abortion because there was no dilator which instrument he felt was a necessity. On cross-examination he admitted he was convicted of abortion in 1953 and again in 1955. He admitted that on one of these occasions the police had "planted" a tray which did not have a dilator. He also admitted he did not use an anesthetic on one occasion. The defense called two medical experts who testified that the equipment found at the clinic was insufficient for a curetment (abortion) without there being substantial danger to the life of the patient. A dilator, suction equipment and oxygen were missing.

Defendant MacEwing also testified in his own behalf. He stated he was an osteopathic doctor and had practiced at the clinic until his license was suspended in 1958. He sold his equipment at that time to Mrs. Walling and Dr. Walker. He admitted he examined Mrs. Hubbard at the clinic but stated he did so only because defendant Reed was not there and because it appeared to be an emergency. He denied he told Mrs. Hubbard he was Dr. Reed. He testified he was appointed executor of Mrs. Walling's estate, that on June 5 he went to the clinic to look for some documents connected with her estate. He stated he was looking for those papers in the same desk where the money was discovered. He, however, denied any knowledge of the money or of any plan to commit abortion.

He admitted he wrote various prescriptions using defendant Reed's name but denied he was paid for doing so. He stated that on the dates the prescriptions were written he had gone to the clinic either to handle some matter in connection with the Walling estate or to pick up his daughter who was being treated by defendant Reed. He stated that

prior to the revocation of his license, during the period when he practiced at the clinic, he had subscribed to certain magazines which were delivered there. He stated that he had neglected to cancel these subscriptions after he lost his license.

Aguilar testified in her own behalf. She admitted she received $500 from Carol and stated she had distributed it in the places where it was found by the police officers. She also admitted what she had said about the $100 marked "O.F." being for office funds was untrue, that in truth it was marked for Owen Felt. She stated that when Dr. Felt called to make the appointment for Carol he indicated that if his diagnosis of Carol's pregnancy was confirmed by defendant Reed's examination he would want to use the clinic for surgery.

Dr. Felt in rebuttal denied that he indicated to Aguilar that he might want to use the clinic for surgery. He stated that because of a physical disability, progressive muscular dystrophy, an ailment that had left him partially paralyzed, he would never perform an operation by himself. On the afternoon of June 5 he was in his office attending to his patients.

Dr. Wade Walker testified that he was 85 years old and had not practiced in the clinic for the last six or seven years. He admitted his name had been put on the lease but denied he paid any money for having it done. It was stipulated that Dr. Walker's name was on the office checking account signature card along with Aguilar's name.

The principal contention of both defendants Reed and MacEwing on appeal is directed at the sufficiency of the evidence to support the abortion charges. No complaint is made by defendant MacEwing that he was improperly convicted for illegally writing prescriptions. Both defendants urge, however, that the evidence was legally insufficient to support the judgments of conspiracy to commit abortion and attempted abortion. Defendant Reed in addition contends it was prejudicial error for the trial court to have allowed the People to cross-examine him and to offer rebuttal evidence concerning the details of his two prior abortion convictions. He also contends the trial court improperly permitted the consolidation of the separate information directed against defendant MacEwing.

Defendant Reed acknowledges the existence of the rule that in examining the record as to the sufficiency of the

evidence all intendments must be made in favor of the jury verdict so as to support the judgment; that issues affecting the credibility of witnesses or the drawing of inferences from the evidence are for the jury's determination; and that where no express agreement to prove conspiracy is shown, circumstantial evidence can support a judgment. He contends, however, no evidence whatever was presented which connected him with a plan to commit abortion other than the fact that three days prior to the date when Carol testified she was to undergo the illegal surgery he had examined her at the clinic.

Defendant Reed cites the rule that statements or acts of third parties cannot establish defendant's participation in an unlawful conspiracy, if they are not known by defendant, made in his presence, or adopted by him. He asserts that this rule eliminated from consideration against him all the evidence of the conversations between Dr. Felt and Carol and between Aguilar and Carol and between Aguilar and the police officers. This contention is without merit.

While the fact of a conspiracy cannot be proved by introduction of evidence of extrajudicial statements of a co-conspirator, nevertheless, for the purpose of permitting introduction of evidence of the extrajudicial acts and declarations of a conspirator, the conspiracy need be proved only to the extent of producing prima facie evidence of the fact. It is not necessary that it be established by a preponderance of the evidence as is required in a civil action, or beyond a reasonable doubt as in a criminal action. (*People* v. *Steccone*, 36 Cal.2d 234, 238 [223 P.2d 17]; *People* v. *Massey*, 151 Cal.App.2d 623, 642 [312 P.2d 365].)

We are satisfied in the case before us that there was sufficient circumstantial evidence to make the required prima facie showing. The following factors appear to justify this determination: It was apparent from the record an abortion was about to take place when the police officers arrived. In one of the rooms of the clinic a pregnant girl in otherwise good health was found prepared for an operation. In another room, equipped with a medical examining bed with stirrups, a tray of surgical instruments and an anesthetic were found. These instruments, according to expert testimony, though not complete or the best desirable, would have been sufficient for an abortion to have been performed.

Connected to these facts were the mysterious circumstances surrounding the operation of the clinic. Defendants Reed and MacEwing were the only two men active in its operation,

but there was no formal responsibility fixed on them. Each attempted to minimize his connection. No adequate records were kept and, according to defendant Reed's testimony, the clinic purportedly was being run by Aguilar, the receptionist-bookkeeper.

Under these circumstances, defendant Reed conducted an examination of Carol, not a general examination but one in the vaginal region, such as would be performed by an abortionist prior to the abortion. Defendant's explanation that he conducted the examination thinking the girl was there for a pessary fitting because the two preceding patients were, is less than persuasive. These circumstances demonstrate the existence of a conspiracy to commit abortion. Neither defendant appears to vigorously contest this and their arguments are directed instead at their connection with the conspiracy. What they contend is in effect that even if there was a conspiracy to perform an abortion they were not connected to it.

Defendant Reed relies on *People* v. *Murphy,* 60 Cal.App.2d 762 [141 P.2d 755], to support his argument that the evidence was insufficient to show a conspiracy. In that case, however, the principal issue was whether the doctor used the instrument with the required intent, namely, with intent to procure a miscarriage. The court held no sufficient showing was made that the doctor had actual knowledge or belief the woman was pregnant. The doctor had testified the woman was not pregnant but had a polyp protruding through the surface of her uterus which he felt had to be removed. Also of significance in the case was the fact the doctor who allegedly referred the girl to defendant did not testify for the prosecution to verify the girl's assertion she was pregnant.

Here, there is no real issue made as to defendant Reed's knowledge of Carol's pregnant condition. His testimony in fact was that he declined to prescribe a pessary because of his belief that she might be pregnant, and it is not unreasonable to infer that information of the results of the blood test given by Dr. Felt indicating pregnancy were passed on to defendant Reed. The evidence in the case before us positively indicates that an illegal operation was to be performed. In the *Murphy* case, *supra,* 60 Cal.App.2d 762, no showing was made that the surgery was for an unlawful purpose or that the woman was pregnant.

We are satisfied the existence of the conspiracy was sufficiently established to permit the trier of fact to consider the acts and declarations of the coconspirators. When considered,

the previously outlined operation takes shape. The process through which the girl came into contact with the would-be abortionist; the referral; the preparations; the use of secrecy; the expectation of the victim that an abortion would be performed on her; the payment of the fee; the admissions; all demonstrate the existence of a conspiracy to perform an abortion.

Defendant MacEwing also contends insufficient evidence was produced linking him to conspiracy to commit abortion. He asserts nothing more than a mere suspicion of his guilt was shown. *People* v. *Massey, supra,* 151 Cal.App. 2d 623, 651, and *Dong Haw* v. *Superior Court,* 81 Cal.App.2d 153, 158 [183 P.2d 724], are cited as being controlling. In these cases the rule was stated that conspiracy cannot be established by suspicions and that mere association with conspirators does not make one guilty of conspiracy.

Defendant MacEwing maintains that neither the intended victim nor the alleged coconspirators directly implicated him. He contends no evidence was presented establishing any contact between the clinic and himself or between the other codefendants and himself other than that he had written prescriptions for defendant Reed's patients or had examined or treated them in defendant's Reed's absence. He also argues that his continued unlawful practice of medicine at the clinic does not link him with the conspiracy or attempt charges. These contentions are not well taken.

The point is not whether or not he was engaged in unlawful practice of medicine at the clinic but that he was conducting that practice in a small medical office used only by defendant Reed and himself, at the very place Carol came for illegal surgery, and that he was there at the time the act was to be accomplished. This, together with the fact he was sitting at the desk where part of the money was found, which money was split up into two $200 and one $100 segments, the two $200 segments matching the presence of the two persons at the situs with medical backgrounds, was substantial evidence in support of the charge of conspiracy.

Both defendants Reed and MacEwing contend the evidence presented was insufficient to establish the attempted abortion charges. With this contention we are in agreement.

As stated in *People* v. *Gallardo,* 41 Cal.2d 47 [257 P.2d 29], at page 66, "In order to establish an attempt, it must appear that the defendant had a specific intent to commit a crime and did a direct, unequivocal act toward that

end; preparation alone is not enough, and some appreciable fragment of the crime must have been accomplished. [Citations.] . . . ▇ There is no evidence that [defendants] started to provide, supply or administer any medicine or to use or employ any instrument or other means to procure the miscarriage of any of the three women. (Pen. Code, § 274.) The conduct of [defendant] Glynn in arranging for operations, filling out hospital cards, and accepting money did not amount to an attempt. [Citations.]'' (For a similar holding see *People* v. *Buffum*, 40 Cal.2d 709 [256 P.2d 317].)

In *People* v. *Reed*, 128 Cal.App.2d 499 [275 P.2d 633], while the intended abortee was not yet on the operating table the defendant took a speculum from the sterilizer and ran cold water over it. He was arrested at that moment. The court held this was sufficient to constitute an attempt saying (p. 502), ''Here defendant started to employ means to procure a miscarriage. [Citations.]''

In *People* v. *Berger*, 131 Cal.App.2d 127 [280 P.2d 136], a case where intent to commit the act was clearly established, the court held that the sterilization of surgical instruments by boiling them in a pan of water was sufficient evidence. In that case the defendant had gone to the girl's home with his instruments, accepted the money and covered a window with a sheet. He was sterilizing the instruments on a stove when the police arrived.

In *People* v. *Bowlby*, 135 Cal.App.2d 519 [287 P.2d 547, 53 A.L.R.2d 1147], the police arrived at a time when the woman was on the table prepared for the operation. Defendant was seated in front of her wearing rubber gloves. He had applied lubricating jelly and was preparing to insert a vaginal speculum. It was held he had unequivocally committed himself.

▇ There is no inconsistency in the sustaining of the conspiracy conviction and the reversal of the conviction on the attempt charges for it is not essential that any of the acts relied upon in support of a charge of conspiracy be an act amounting to a criminal attempt. (See *People* v. *Shaw*, 115 Cal.App.2d 597, 601 [252 P.2d 670], and *People* v. *Ragone*, 84 Cal.App.2d 476, 480 [191 P.2d 126].)

▇ Defendant Reed contends the trial court committed prejudicial error in allowing the People to cross-examine him and to put on rebuttal evidence as to details of two prior abortion convictions. Defense counsel at the trial objected to the use of one of the convictions on the ground that it was a mis-

demeanor violation and that since it was a misdemeanor it could not be used for impeachment purposes. It was asserted that since the sentence prescribed was one year in the county jail the offense was reduced to a misdemeanor.

Section 17 of the Penal Code controls the reduction of felonies to misdemeanors. It provides: "A felony is a crime which is punishable with death or by imprisonment in the state prison. Every other crime is a misdemeanor. When a crime, punishable by imprisonment in the state prison, is also punishable by fine or imprisonment in a county jail, in the discretion of the court, it shall be deemed a misdemeanor for all purposes after a judgment imposing a punishment other than imprisonment in the state prison."

Defendant relies on *People* v. *Hamilton,* 33 Cal.2d 45 [198 P.2d 873]. In that case the prior conviction was for second degree burglary. The court held the trial court committed error in allowing the use of the conviction because (p. 50) "[a]s to a crime which may be either a misdemeanor or a felony, depending upon the punishment imposed therefor (Pen. Code, § 17), it is the punishment specified by the sentence which determines the character of the crime 'for all purposes' (§ 17) including that of impeachment. [Citations.]"

If abortion was a crime punishable by fine or imprisonment in a county jail, defendant's contention would be well taken. However, the crime of abortion is not one of the offenses which is reducible to a misdemeanor by the imposition of a county jail sentence. The abortion statute (Pen. Code, § 274) provides only for a state prison sentence of not less than two years. (See *People* v. *Walters,* 190 Cal.App.2d 98, 100-102 [11 Cal.Rptr. 597].) Thus, an erroneous sentence does not have the effect of reducing the crime to the status of a misdemeanor.

 Defendant Reed contends that the trial court committed error in allowing the People to cross-examine him and to put on rebuttal evidence as to details of the prior convictions. It is the People's contention that use of the priors was proper other-crimes evidence. Evidence of other crimes is admissible whenever it is relevant to a material issue of the case and it should be excluded only where its sole purpose and effect is to show bad moral character or disposition to commit crime. (*People* v. *Peete,* 28 Cal.2d 306, 314-315 [169 P.2d 924].) It is also admissible to show intent where intent is in issue. (*People* v. *Morani,* 196 Cal. 154, 157-161 [236 P. 135].) It is also commonly re-

ceived when the crimes are similar in nature (*People* v. *Miner,* 96 Cal.App.2d 43, 51 [214 P.2d 557]), and it has been held that it is not necessary to prove the crime is identical in every detail. (*People* v. *Fowler,* 119 Cal.App.2d 657, 662 [260 P.2d 89].)

 In the case at hand, the cross-examination pertaining to the priors dealt with whether an anesthetic had been used by defendant Reed when he committed one of the abortions for which he was convicted and whether there was a dilator present on the other occasion.

Defense counsel attempted to prove no abortion was going to take place because a dilator was missing from the instrument tray and because there was not sufficient anesthetic or a proper syringe to administer it. To counter this line of defense, the People, in examining defendant Reed, attempted to show that he had committed abortions in the past without a dilator and without use of an anesthetic. Moreover, as in *People* v. *Malone,* 173 Cal.App.2d 234, 245 [343 P.2d 333], where a conspiracy charge was involved, it was held that a necessary element of the crime is intent to violate the law. A showing of similarity in the crimes tends to establish this element of intent. Moreover, the act of performing an abortion without a dilator or a proper anesthetic on prior occasions and the fact that the clinic equipment lacked these things would tend to show a trademark or mode of operation.

 The rule limiting the use of a prior felony to impeachment does not preclude its use in respect to other relevant issues in the case. (*People* v. *Aquilante,* 208 Cal.App.2d 530, 536 [25 Cal.Rptr. 344].)

 Defendant Reed's contention that the crimes were too remote in time to be admissible as other-crimes evidence is without merit. The abortions took place in 1952 and 1954. This time lapse would not substantially affect the value of the evidence. If defendant could conduct an abortion in 1952 without using an anesthetic or one in 1954 without a dilator he could surely do so in 1961. (*People* v. *Burns,* 109 Cal.App. 2d 524, 538 [241 P.2d 308, 242 P.2d 9].)

 Defendant Reed contends the trial court erred by joining the information concerning defendant MacEwing's writing of prescriptions to the abortion counts. Defendant Reed argues that if a separate trial were held the jury would not have heard that his name was misused on prescriptions by defendant MacEwing.

It is contended the two informations were not "connected

together in their commission," as is required by Penal Code section 954. With this we do not agree. ▇ Section 954 permits joinder where there is a common element of substantial importance. (*People* v. *Stone*, 155 Cal.App.2d 259, 268-269 [318 P.2d 25].) ▇ In the present case a common element of substantial importance was the fact the clinic was used to carry on the illegal activity charged in each information. Even had the prescription counts not been charged, the evidence relating to defendant MacEwing's misuse of defendant Reed's name on the prescriptions would have been admissible to prove the conspiracy charge.

Judgments of convictions of both defendants as to Count I of the information (SC 245144), conspiracy to commit abortion, affirmed; judgments of convictions as to both defendants as to Count II of the same information, attempted abortion, reversed. Judgment of conviction as to defendant MacEwing on Counts I, II and III of the information (SC 245639), violation of section 11162, Health and Safety Code, affirmed. The purported appeals from the orders denying motions for new trials are dismissed.

Burke, P. J., and Kingsley, J., concurred.

A petition for a rehearing was denied May 29, 1963, and the petition of appellant Reed for a hearing by the Supreme Court was denied July 3, 1963.